REVISED DECEMBER 18, 2001
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-41299
_____

UNITED STATES OF AMERICA

                              Plaintiff-Appellee

     v.

RONALD SCOTT PAUL

                              Defendant-Appellant

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

November 19, 2001

Before KING, Chief Judge, DAVIS, Circuit Judge, and VANCE,
District Judge.[*]

KING, Chief Judge:

     After pleading guilty to a charge of knowingly possessing

child pornography in violation of 18 U.S.C. § 2252A, Defendant-

Appellant Ronald Scott Paul was sentenced to five years of

imprisonment and three years of supervised release pursuant to

section 2G2.2 of the United States Sentencing Guidelines.  Paul

_____

     [*]     District Judge of the Eastern District of Louisiana,
sitting by designation.

1

appeals to this court, challenging the district court's sentencing determination, the conditions of his supervised release, and the constitutionality of the statute of conviction. For the following reasons, we AFFIRM Paul's conviction and his sentencing determination, including the conditions of supervised release.

## I. Factual and Procedural Background

On May 8, 2000, Defendant-Appellant Ronald Scott Paul took his personal computer to Electronic Services and Repair, a small computer repair business in Port Isabel, Texas. While working on the computer, a technician discovered child pornography on the hard drive and contacted the Federal Bureau of Investigations ("FBI"). The FBI's background check on Paul revealed a 1986 offense involving child pornography. After Paul had retrieved his computer from the repair technician, FBI agents searched Paul's residence pursuant to a valid warrant. The agents seized the computer, which contained a large number of files with images of child pornography that had been downloaded from the Internet. The agents also seized assorted photographs of children, magazines with nude photographs of children and adults, books with pictures of nude prepubescent boys, videotapes of random children filmed in public settings, a large bag of children's clothes, and several children's swimsuits covered with sand.

Additionally, the agents seized a medical bag containing

basic medical supplies and Spanish-language flyers advertising lice removal for children. In the flyers, Paul informed parents that he would spray their children with a product that kills lice. The flyers also stated that Paul would conduct a complete physical examination on each child for "overall health," which necessarily required the child to completely undress. The agents also found between ten and twenty personal cameras in Paul's residence.[1]

Further review of Paul's computer revealed electronic mail communications ("e-mails") discussing sources of child pornography, including websites, chat rooms, and newsgroups that allowed both receiving and sending of pornographic images. In one of these e-mails, Paul discussed how easy it was to find "young friends" by scouting single, dysfunctional parents through Alcoholics Anonymous or local welfare offices and winning their friendship, thereby securing access to their young sons.

On July 17, 2000, Paul pled guilty to one charge of knowingly possessing a computer hard drive with three or more images of child pornography that traveled through interstate commerce, in violation of the Child Pornography Prevention Act. See 18 U.S.C. § 2252A(a)(5)(B) (1994). The government offered

---

[1] According to Paul, his hobbies include photography and camera repair. He maintains that he earned about $200 monthly purchasing broken cameras over the Internet, fixing them, and reselling them.

four images as samples of the child pornography that Paul possessed.  Paul admitted that these exhibits were images he received from the Internet and stored on his computer hard drive.

After Paul pled guilty to possession of child pornography and was rearraigned, the court ordered the probation office to prepare a presentence report ("PSR").  Applying section 2G2.2 of the Sentencing Guidelines[2] ("section 2G2.2"), the PSR determined that Paul's total offense level was 35.  See U.S. SENTENCING GUIDELINES MANUAL § 2G2.2 (1998).  The PSR then factored in Paul's criminal history category (category I), which resulted in an imprisonment range of 121 to 151 months.  However, the PSR noted that the statutory maximum penalty was 60 months.

At the sentencing hearing, Paul objected to the PSR's use of section 2G2.2, arguing that the district court should have applied section 2G2.4[3] instead because he was charged with possession of child pornography rather than trafficking in child pornography.[4]  The probation officer and the government both

---

[2]     Section 2G2.2 is applicable to "Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; [and] Possessing Material Involving the Sexual Exploitation of a Minor With Intent to Traffic."  U.S. SENTENCING GUIDELINES MANUAL § 2G2.2 (1998).

[3]     Section 2G2.4 is applicable to "Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct."  U.S. SENTENCING GUIDELINES MANUAL § 2G2.4 (1998).

[4]     According to Paul, applying section 2G2.4 would have yielded a much shorter imprisonment range of 27 to 33 months.

4

maintained that section 2G2.2 was the appropriate guideline because a cross-reference in section 2G2.4 requires use of section 2G2.2 if there is indication of "intent to traffic."[5] See U.S. SENTENCING GUIDELINES MANUAL § 2G2.4 (1998).  To support its claim that Paul intended to traffic in child pornography, the government offered five e-mails from Paul's computer.[6]  Paul

---

[5]    The cross-reference reads: "[i]f the offense involved trafficking in material involving the sexual exploitation of a minor (including receiving, transporting, shipping, advertising, or possessing material involving the sexual exploitation of a minor with intent to traffic), apply §2G2.2."  U.S. SENTENCING GUIDELINES MANUAL § 2G2.4 (1998).

[6]    Exhibit One was an e-mail from Ultimate Anonymity (a business providing anonymous Internet accounts) confirming Paul's account.
   Exhibit Two was an e-mail exchange between Paul and Stewart Anderson on October 29, 1999, in which Anderson warned Paul not to post on the newsgroup alt.binaries.pictures.asparagus, as this newsgroup was considered illegal and hackers could find out the identities of those posting messages.  Anderson advised Paul to view or download pictures rather than post to newsgroups, and told him that it might be safe to post "innocent" pictures in a newsgroup called alt.binaries.pictures.boys.  Paul replied to Anderson, thanking him for the advice and stating: "It was me. I'm still very new at this and don't understand the do's and don'ts.  But with help for [sic] friends I'll learn, hopefully before I get busted for something I don't understand."
   Exhibit Three was an e-mail exchange between Paul and an unidentified individual calling himself "Ghost Writer."  Paul asked Ghost Writer whether a series of symbols that he had seen in a newsgroup was a picture or a code and how to read it.  When Ghost Writer responded that he was unsure, Paul replied: "It is there.  I think I'm doing it right.  I'm not downloading anything and I'm not posting now, Caveman clued me in on that."
   Exhibits Four and Five are e-mails from Paul to Anderson dated October 30 and 31, 1999, in which Paul stated his desire to give Anderson three books with titles suggesting that they contained child pornography.  Paul told Anderson that he could pay the postage, but that otherwise the books would be a gift.

argued that these e-mails were inadequate to demonstrate trafficking or intent to traffic, as the messages contain no direct statements indicating that he sent images through the mail or the Internet.

The district court overruled Paul's objection, determining that pursuant to the section 2G2.4 cross-reference, section 2G2.2 was the appropriate guideline. Because the resulting sentence was greater than the statutory maximum, the district court imposed the statutory maximum sentence of five years' imprisonment, plus a three-year term of supervised release, and a special assessment fee of $100.

The district court imposed a number of special conditions on Paul's supervised release term. He must "undergo a complete psychological evaluation and/or participate in a sex offender/mental health program as deemed necessary and approved by the probation officer." Paul is also directed to avoid "direct and indirect contact with minors," as well as "places, establishments, and areas frequented by minors," and is prohibited from "engaging in any paid occupation or volunteer service which exposes him either directly or indirectly to minors." The conditions further provide that Paul "shall not have[,] possess or have access to computers, the Internet, photographic equipment, audio/video equipment, or any item capable of producing a visual image." Finally, Paul is

6

instructed to "register with the sex offender registration in any state where [he] . . . resides, is employed, carries on a vocation, or is a student, as directed by the probation officer and as required by law."

On appeal, Paul challenges his conviction and sentence on three grounds. First, Paul argues that the statute of conviction, the Child Pornography Prevention Act ("CPPA"), is unconstitutionally vague and overbroad. Second, he argues that the district court improperly applied the Sentencing Guidelines in using section 2G2.2 to determine his base offense level. Finally, Paul challenges the conditions of his supervised release, arguing that he was not given pre-sentence notice of the requirement that he register as a sex offender and that the district court abused its discretion by imposing special conditions restricting his contact with minors and his ability to access "computers, the Internet, photographic equipment, audio-video equipment, or any item capable of producing a visual image."

## II. The Constitutionality of the Child Pornography Prevention Act

Paul contends that the language in 18 U.S.C. § 2256(8)(B) defining "child pornography" to include an image that "appears to be" or "conveys the impression" of minors engaging in sexually explicit conduct is impermissibly vague and overbroad under the First Amendment. He acknowledges that this circuit's recent

7

precedent forecloses this facial challenge. See United States v. Fox, 248 F.3d 394, 404-07 (5th Cir. 2001) (holding that prohibiting possession of an image that "appears to be" or "conveys the impression of" minors engaging in sexually explicit conduct does not violate the First Amendment). However, Paul points out that the Supreme Court recently granted certiorari in Free Speech Coalition v. Reno, 198 F.3d 1083 (9th Cir. 1999), cert. granted sub nom., Ashcroft v. Free Speech Coalition, 121 S.Ct. 876 (2001), to consider whether this language in the CPPA is unconstitutionally vague or overbroad. Thus, he asks this court to postpone deciding the issue until the Supreme Court decides Free Speech Coalition.

We decline this invitation. A facial challenge to the CPPA is foreclosed by Fox, which is the binding law of this circuit. Moreover, as the government correctly points out, the Supreme Court's resolution of Free Speech Coalition will not affect the validity of Paul's conviction, as he was not convicted under the portions of the statute that are under challenge in that case. Paul's indictment specifically references the definition of "child pornography" contained in 18 U.S.C. § 2256(8)(A), which defines child pornography as any visual depiction of sexually explicit conduct where "the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct." This definition, unlike the definition contained in §

8

2256(8)(B) that is at issue in <u>Free Speech Coalition</u>, does not contain the language that Paul asserts is constitutionally problematic.

Delaying resolution of this constitutional challenge until after the Supreme Court decides <u>Free Speech Coalition</u> would be neither necessary nor useful, as the charges on which Paul was indicted and to which he pled guilty reference a definitional provision of the statute that is not challenged in <u>Free Speech Coalition</u>.  Accordingly, we affirm Paul's conviction under the CPPA.

### III.  The Sentencing Determination

This court reviews the district court's application of the Sentencing Guidelines de novo and its factual findings for clear error.  <u>See</u> <u>United States v. Stevenson</u>, 126 F.3d 662, 664 (5th Cir. 1997).  We "give due deference to the district court's application of the guidelines to the facts."  18 U.S.C. § 3742(e) (1994).[7]

"When sentencing a defendant, the district court must first determine which offense guideline section is most applicable to

---

[7]    The Supreme Court recently elaborated on the meaning of this statutory provision in <u>United States v. Buford</u>, 121 S.Ct. 1276 (2001).  The Court held that the deference that is due under 18 U.S.C. § 3742(e) depends on the nature of the question presented.  In that case, the Court determined that deferential review was appropriate "[i]n light of the fact-bound nature of the legal decision, the comparatively greater expertise of the District Court, and the limited value of uniform court of appeals precedent."  <u>Id.</u> at 1281.

the offense of conviction, generally by reference to the guidelines' statutory index found at Appendix A thereto." United States v. Principe, 203 F.3d 849, 851 (5th Cir. 2000). The entry in the statutory index for 18 U.S.C. § 2252A (the statute of conviction in the instant case) refers to both section 2G2.2 and section 2G2.4 as the applicable guidelines. If the statutory index refers to more than one guideline section for a particular statute, "the district court must select the most appropriate section based upon the nature of the conduct charged in the count for which the defendant was convicted." Id.; see also U.S. SENTENCING GUIDELINES MANUAL § 1B1.2 cmt. n.1 (1998).

Paul was convicted of "possession of a computer hard drive that contained three or more images of child pornography." Thus, Principe and the commentary to section 1B1.2 indicate that, of the two guidelines referenced in the statutory index for § 2252A, the appropriate guideline for Paul's offense is section 2G2.4 (the guideline applicable to "Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct"). However, section 2G2.4 contains a cross-reference instructing sentencing courts to apply section 2G2.2 (the provision applicable to "Trafficking in Material Involving Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; [and] Possessing Material Involving the Sexual Exploitation of a Minor with Intent to

10

Traffic") if the possession offense involves trafficking in child pornography, including receiving, transporting, shipping, advertising, or possessing child pornography with intent to traffic. In determining whether the cross-reference provision is applicable, the sentencing court may consider other "relevant conduct" in addition to the conduct charged in the count for which Paul was convicted.[8]

The district court primarily relied upon the e-mails offered by the government at the sentencing hearing in concluding that section 2G2.2 was the appropriate guideline in the instant case. The court found that the e-mail exchange between Paul and Anderson discussing the books that Paul wanted to give to Anderson was sufficient evidence of intent to traffic. The district court also pointed to Paul and Anderson's earlier e-mail exchange regarding Paul's posting on the "asparagus" newsgroup and his e-mail exchange with Ghost Writer as further indications that Paul had, at some point, posted images that he acknowledged could get him "busted." While there was no indication from either of these e-mail exchanges that the "postings" in question

_____

[8]    Section 1B1.3 of the Sentencing Guidelines instructs that "cross-references in Chapter Two . . . shall be determined on the basis of . . . all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . all harm that resulted from the acts . . . and all harm that was the object of such acts."  U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a) (1998).

11

were images (as opposed to text messages), the district court found that it was reasonable to infer that images were involved.

Paul contends that the district court erred in invoking section 2G2.4's cross-reference to section 2G2.2 because this case did not involve trafficking in child pornography.  Paul argues that his offer to give Anderson the book collection is insufficient to support a finding that Paul was trafficking or intended to traffic in child pornography.  He contends that giving Anderson the books would have been a purely gratuitous act, rather than bartering or trading, and thus cannot qualify as trafficking.  Moreover, Paul claims that he conditioned his offer to give Anderson the books on Paul's moving to Honduras, which Paul maintains that he never actually intended to do.  Paul similarly argues that the October 29 e-mail exchange regarding his posting activities on the asparagus newsgroup cannot show trafficking or intent to traffic, as this exchange demonstrates only that he "posted one unknown item at an unknown time" at least seven months before he was charged in the instant case.

Paul also contends that in order for the cross-reference in section 2G2.4 to apply, the government must prove that the items allegedly trafficked actually contained child pornography. Because the government did not prove that either the postings Paul referred to in his e-mails or the books Paul offered to give Anderson contained a "lascivious exhibition of the genitals,"

12

Paul maintains that any conclusion that these images contained child pornography is purely speculative.

In determining whether the district court correctly applied the Sentencing Guidelines to the facts of the instant case, this court adopts a deferential standard of review. As the Supreme Court indicated in <u>Buford</u>, deference to the district court's determination is appropriate when the application of a Sentencing Guidelines provision involves an extremely fact-bound inquiry, when the "legal results depend[] heavily upon an understanding of the significance of case-specific details," and when there is correspondingly limited value in uniform appellate precedent due to the level of factual nuance involved. 121 S.Ct. at 1280-81. Without question, determining whether the language contained in Paul's e-mails adequately evidences his intent to traffic in child pornography in light of his other "relevant conduct" is a highly fact-bound inquiry. Consequently, the district court's familiarity with the details of the case is extremely valuable to this determination, and the precedential effect of the result is minimal. Under <u>Buford</u>, deferential review is therefore appropriate.

The district court determined that Paul's conduct went beyond mere possession and constituted "possession with intent to traffic." There are two implicit determinations underlying this conclusion that warrant detailed analysis: (1) the determination

13

that the e-mails were indicative of an intent to "traffic," and (2) the determination that the materials that Paul intended to traffic constituted "child pornography" under the statute of conviction.

The district court's conclusion that Paul "intended to traffic" in child pornography is supported by the evidence. Initially, we agree with the district court's determination that Paul's offer to send three child pornography books to Anderson in exchange for the cost of postage was sufficient to demonstrate his "intent to traffic" in child pornography. The term "traffic," while not defined in the Sentencing Guidelines, traditionally encompasses both buying and selling commodities for money and exchanging commodities by barter. See United States v. Horn, 187 F.3d 781, 791 (8th Cir. 1999) (citing May v. Sloan, 101 U.S. 231, 237 (1879)); see also BLACK'S LAW DICTIONARY 1495 (6th ed. 1990) (defining "traffic" as "commerce; trade; sale or exchange of merchandise, bills, money, and the like . . ."). While Paul characterizes the proposed transaction with Anderson as a "gift," we defer to the district court's implicit determination that the proposed transaction was sufficiently akin to a sale or exchange of merchandise to constitute proposed "trafficking."

Moreover, even if the transaction involving the books was not sufficient to indicate Paul's intent to traffic, the record reveals that Paul engaged in actual trafficking as well. Paul's

14

computer contained hundreds of images of child pornography obtained from the Internet.[9]  In addition, Paul's e-mail exchanges with both Anderson and Ghost Writer indicate that, at some point in time, he posted material to child pornography newsgroups as well.  As the Second Circuit explained in United States v. Johnson, because exchange or barter is a form of trafficking, sending and receiving pornographic images via the Internet constitutes "trafficking" sufficient to invoke the cross-reference in section 2G2.4.  See 221 F.3d 83, 98 (2d. Cir. 2000) (finding that "trafficking" occurred when the defendant exchanged child pornography with others by sending and receiving images over the Internet).

While Paul may or may not have intended to barter particular images with specific persons when he posted and downloaded images, his participation in the free exchange of images that is characteristic of online child pornography communities nonetheless constitutes trafficking.  The consequences of this type of Internet trafficking are the same as (if not worse than) the consequences of a more direct, person-to-person barter or exchange, and application of the 2G2.4 cross-reference is equally justified.  As the Johnson court explained, "the guidelines expressly contemplate more severe punishment by application of

---

[9]    At the time that Paul pled guilty to the instant offense, he conceded that he obtained the images introduced by the government from the Internet.

15

Section 2G2.2 if the conduct involved something more than 'simple possession.'" Id. Sending and receiving images of child pornography over the Internet justifies this harsher punishment because "such dissemination of child pornography is likely to expand the market for it and thus to cause more harm than mere possession." Id. Because we agree with the Second Circuit that sending and receiving images over the Internet constitutes "trafficking," we find that the district court had adequate circumstantial evidence to support its conclusion that Paul more likely than not trafficked in (or intended to traffic in) child pornography.

The second assumption underlying the district court's application of the 2G2.4 cross-reference is that the particular images that Paul trafficked or intended to traffic involved sexual exploitation of a minor. Paul is correct that the government bears the burden of demonstrating that section 2G2.4's cross-reference to section 2G2.2 is applicable. However, the government must prove the factors underlying a sentencing determination only by a preponderance of the evidence. See United States v. Gaytan, 74 F.3d 545, 558 (5th Cir. 1996) ("It is well-established that the preponderance standard is the applicable standard for sentencing purposes."); see also United States v. Pewenofkit, 173 F.3d 865 (10th Cir. 1999) (unpublished table decision), available at 1999 WL 169429 (applying a

preponderance of the evidence standard when determining the applicability of a cross-reference provision).  Given the deferential standard of review, there is adequate circumstantial evidence to support the district court's determination that the government proved by a preponderance of the evidence that the images contained child pornography.

While the FBI did not find the books that Paul offered to Anderson in the search of Paul's house, the titles of the books ("Boys Will Be Boys," "Young Aphrodites," and "Children of Many Lands") suggest that they contained child pornography.  Moreover, Paul described these books in his e-mail to Anderson as out-of-print "BL" (or "boy lover") books.  Finally, the images that were found in the search of Paul's residence – including images of children's genitals, images of children engaged in sexual intercourse, and sadistic images of infants – provide circumstantial evidence that the books that Paul wanted to give Anderson contained images of a similar nature.

In addition, while the e-mail exchange between Paul and Anderson addressing Paul's posting activities on the asparagus newsgroup does not contain an explicit acknowledgment that Paul had posted images, the government presented testimony at the sentencing determination indicating that "alt.binary.pictures" newsgroups are generally used for posting pictures.  Moreover, in Anderson's e-mail warning Paul that the asparagus newsgroup was

17

an illegal newsgroup, he informed Paul that it was "safer" just to watch or download pictures rather than to "get involved by posting" and suggested that if Paul wanted to post, he should post "innocent" pictures at another newsgroup called alt.binaries.pictures.boys.  This language also provides evidence that the posting referred to in this e-mail exchange contained child pornography.

While Paul is correct that the district court cannot make sentencing determinations based on pure speculation, there is sufficient circumstantial evidence here to support the district court's determination that the images in question more likely than not contained child pornography.  Accordingly, we find that the district court acted appropriately in applying the cross-reference contained in section 2G2.4.  We affirm the portion of the district court's sentence prescribing Paul's term of imprisonment.

### IV.  The Special Conditions of Supervised Release

A district court has wide discretion in imposing terms and conditions of supervised release.  However, this discretion is limited by 18 U.S.C. § 3583(d), which provides that a court may impose special conditions of supervised release only when the conditions meet certain criteria.[10]   First, special conditions

---

[10]    These statutory criteria have also been incorporated into the Sentencing Guidelines.  See U.S. SENTENCING GUIDELINES MANUAL § 5D1.3(b) (1998).

18

of supervised release must be reasonably related to the factors set forth in § 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D). See 18 U.S.C. § 3583(d) (1994). These factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the need "to afford adequate deterrence to criminal conduct," (3) the need "to protect the public from further crimes of the defendant," and (4) the need "to provide the defendant with needed [training], medical care, or other correctional treatment in the most effective manner."[11]   18 U.S.C. § 3553(a)(1)-(2) (1994). In addition, supervised release conditions cannot involve a greater deprivation of liberty than is reasonably necessary to achieve the latter three statutory goals. See 18 U.S.C. § 3583(d) (1994). We review the district court's determination of supervised release conditions for abuse of discretion. United States v. Coenen, 135 F.3d 938, 940 (5th Cir. 1998).

A.  The Restrictions on Contact with Minors

   Paul challenges the special conditions requiring him to avoid "direct and indirect contact with minors," prohibiting him from "engaging in any paid occupation or volunteer service which exposes him either directly or indirectly to minors," and instructing him to "avoid places, establishments, and areas

_____

   [11]    This criterion is not relevant in the instant case, as Paul does not challenge the condition requiring him to "participate in a sex offender/mental health program as deemed necessary and approved by the probation officer."

19

frequented by minors." He argues that these restrictions are impermissibly vague and do not provide him with fair notice of the prohibited conduct.

Paul also contends that these associational restrictions are overly broad.[12] He argues that the prohibition on "indirect" contact with minors limits him from visiting "a restaurant [or] any retail establishment such as a grocery store or a department store" due to the possibility that he might indirectly come into contact with minors. Paul similarly points out that he could inadvertently violate the terms of his supervised release through chance encounters. While he concedes that courts generally interpret associational restrictions to exclude incidental contact, Paul argues that the provision prohibiting "indirect" contact with minors encompasses such incidental or chance encounters.

A number of our sister circuits have upheld restrictions on contact with minors similar to those at issue in the instant case. See, e.g., United States v. Loy, 237 F.3d 251, 267-69 (3d Cir. 2001) (upholding a condition barring the offender from all "unsupervised contact with minors"); United States v. Bee, 162 F.3d 1232, 1235-36 (9th Cir. 1998) (upholding a condition that

---

[12]    We interpret this "overbreadth" claim to argue that the supervised release condition violates the second statutory criterion outlined above (i.e., the requirement that supervised release conditions must involve no greater deprivation of liberty than is reasonably necessary in light of the need to protect the public and prevent recidivism).

the offender "not have contact with children under the age of 18 unless approved by [his] probation officer" and that he "not loiter within 100 feet of school yards, parks, playgrounds, arcades, or other places primarily used by children under the age of 18").  But see United States v. Peterson, 248 F.3d 79, 86 (2d Cir. 2001) (finding that a restriction prohibiting the offender from "being on any school grounds, child care center, playground, park, recreational facility, or in any area in which children are likely to congregate" was ambiguous and remanding to the sentencing court for clarification).  The primary differences between the language of the provisions governing Paul's release and the language of the provisions at issue in Bee and Peterson are the prohibition on "indirect" contact with minors (i.e., the basis of Paul's "overbreadth" claim) and the failure to specify particular locations where Paul is prohibited from going (i.e., the basis of Paul's vagueness claim).

We first address Paul's overbreadth claim.  Contrary to Paul's assertion, the prohibition on "indirect" contact with minors does not encompass chance or incidental encounters with children.  As the Third Circuit noted in Loy, "[a]t this point, it is well established that associational conditions do not extend to casual or chance meetings."  237 F.3d at 269 (citing Arciniega v. Freeman, 404 U.S. 4, 4 (1971) (per curiam)).  To the extent that the prohibition on "indirect" contact in the instant

21

case might be interpreted to encompass such casual encounters, this court is well within its authority to interpret the restriction to exclude such casual or incidental encounters. See id. (interpreting the restriction at issue to exclude chance encounters). So construed, the inclusion of the word "indirect" in Paul's supervisory restrictions does not render these restrictions unduly broad.

A more difficult question is presented by Paul's vagueness challenge to the supervised release condition instructing him to avoid "places, establishments, and areas frequented by minors." Restrictions on an offender's ability to interact with particular groups of people, to hold certain types of employment, and to frequent certain places must provide "fair notice" of the prohibited conduct. See Loy, 237 F.3d at 262 (noting that the same principles of due process and notice that apply to criminal statutes apply to supervised release conditions).

In Peterson, the Second Circuit analyzed a supervised release condition that is somewhat similar to Paul's. In that case, the court held that a restriction prohibiting the offender from being "on any school grounds, child care center, playground, park, recreational facility, or in any area in which children are likely to congregate" was impermissibly vague. However, it is important to note that the court in Peterson did not find that the phrase "in any area in which children are likely to

22

congregate" was vague.  Rather, the Second Circuit remanded the case to the sentencing court because the court found that it was unclear from the language of the restriction whether the general clause modified the preceding list of specific locations. Peterson, 248 F.3d at 86.  The court determined that if the phrase "in any area in which children are likely to congregate" did not modify the previous list, then the prohibition would not be reasonably related to the defendant's offense, as the restriction would prohibit the defendant from visiting parks or recreational facilities not frequented by children.  See id.

Paul's supervised release condition is not ambiguous in the manner of the provision at issue in Peterson.  It is clear from the plain language of Paul's restriction that he is permitted to visit places, establishments, or areas that are not frequented by minors.  The only potential vagueness problem with the restriction at issue in the instant case is whether a reasonable person can predict which specific locations Paul is permitted to frequent.

This lack of specificity is not necessarily fatal to the validity of the restriction.  As the First Circuit noted in United States v. Gallo, while a probationer "is entitled to notice of what behavior will result in a violation, so that he may guide his actions accordingly . . . [c]onditions of probation do not have to be cast in letters six feet high, or to describe every possible permutation, or to spell out every last,

23

self-evident detail." 20 F.3d 7, 12 (1st Cir. 1993). Conditions of probation "may afford fair warning even if they are not precise to the point of pedantry. In short, conditions of probation can be written — and must be read — in a commonsense way." Id.

Certainly, it would be impossible to list within the text of Paul's condition every specific location that he is prohibited from frequenting during the term of his release. Sentencing courts must inevitably use categorical terms to frame the contours of supervised release conditions. Such categorical terms can provide adequate notice of prohibited conduct when there is a commonsense understanding of what activities the categories encompass. Indeed, it is well established that the requirement of reasonable certainty "does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." Birzon v. King, 469 F.2d 1241, 1243 (2d Cir. 1972) (quoting Sproles v. Binford, 286 U.S. 374, 393 (1932)). We find that there is sufficient common understanding of the types of locations that constitute "places, establishments, and areas frequented by minors" to satisfy the constitutional requirement of reasonable certainty in this case.[13]

---

[13] A number of other courts have reached the same conclusion in evaluating conditions of probation or supervised release that are materially similar to Paul's restrictions. See, e.g., State v. Riles, 957 P.2d 655, 666 (Wash. 1998) (finding

The supervised release conditions restricting Paul's contact with minors are neither impermissibly vague nor unreasonably broad.  These restrictions are reasonably necessary in light of the nature and circumstances of Paul's offense and the legitimate need to prevent recidivism and protect the public.  The district court thus did not abuse its discretion in imposing these restrictions.

B.  The Restrictions on Access to Computers and the Internet

Paul argues that the condition of his supervised release prohibiting him from having, possessing, or having access to "computers, the Internet, photographic equipment, audio/video equipment, or any item capable of producing a visual image" is

_____

that a restriction instructing the defendant to "avoid places where minors congregate" and not to "frequent places where minors are known to congregate" was not impermissibly vague); cf. Britt v. State, 775 So.2d 415, 416-17 (Fla. Dist. Ct. App. 2001) (finding that a restriction prohibiting the defendant from doing "volunteer work, employment, or community activity at any school, daycare center, park, playground, or other place where children regularly congregate" and prohibiting the defendant from "living within 1,000 feet of a school, daycare center, park, playground, or other place where children regularly congregate" was not impermissibly vague) (emphasis added); State v. Simonetto, 606 N.W.2d 275, 276-77 (Wis. Ct. App. 1999) (finding that a restriction instructing the defendant "not to go where children may congregate" was not impermissibly vague when regulatory guidance indicated that this restriction included, but was not limited to, schools, day care centers, playgrounds, parks, beaches, pools, shopping malls, theaters, or festivals).  But see Carswell v. State, 721 N.E.2d 1255, 1260 (Ind. Ct. App. 1999) (concluding that a condition prohibiting the defendant from residing within two blocks of "any area where children congregate" was impermissibly vague).

25

unreasonably broad.[14]  We will address the restriction on Paul's access to computers and the Internet in this section.  We will discuss the ban on access to photographic equipment and audio/video equipment in the following section.

Paul contends that a blanket prohibition on computer or Internet use is excessively broad and cannot be justified based solely on the fact that his offense involved a computer and the Internet.  He points out that computers and Internet access have become indispensable communication tools in the modern world and that the restriction imposed by the district court would prohibit him from accessing computers and the Internet for legitimate purposes, such as word processing and research.

The government responds that the order prohibiting Paul from using a computer or the Internet is rationally related to his offense and that such an order is an appropriate public protection measure.  The government points out that Paul's computer contained over 1200 images of child pornography and contained evidence that Paul had used the Internet to access child pornography chat rooms, bulletin boards, and newsgroups.  According to the government, Paul also used his e-mail to advise fellow consumers of child pornography how to "scout" single,

---

[14]    Again, we interpret this "overbreadth" claim to argue that the supervised release condition is inappropriate under 18 U.S.C. § 3583(d) because it involves greater deprivation of liberty than is reasonably necessary in light of the need to protect the public and prevent recidivism.

dysfunctional parents and gain access to their children and to solicit the participation of like-minded individuals in trips to "visit" children in Mexico. Under these circumstances, the government argues, restricting Paul's access to computers and the Internet is reasonably tailored to his offense and conviction and "serves the dual purpose of deterrence and public protection."

The government correctly points out that a number of courts have upheld Internet and computer-use prohibitions as conditions of supervised release. See, e.g., United States v. Crandon, 173 F.3d 122, 127-28 (3d Cir. 1999) (upholding an Internet restriction as a condition of supervised release for a child pornography offender); United States v. Mitnick, 145 F.3d 1342 (unpublished table decision), available at 1998 WL 255343 (9th Cir. 1998) (determining that the district court did not abuse its discretion in prohibiting a defendant convicted of offenses related to computer "hacking" from accessing "computers, computer-related equipment, and certain telecommunications devices" during his probationary period without prior approval of his probation officer).[15]

---

[15] While at least one circuit has rejected a probationary prohibition on computer and Internet usage, the facts at issue in that case were substantially dissimilar to the instant case. See Peterson, 248 F.3d at 81-83 (rejecting a probationary condition dictating that the defendant "shall not possess, purchase, or use a computer or computer equipment . . . except for employment purposes"). In Peterson, the defendant had been convicted of bank larceny, but a number of his conditions of supervised release, including the computer and Internet restrictions, were actually related to his prior conviction for a sex offense rather

Most factually analogous to the instant case is <u>Crandon</u>, wherein a defendant convicted of receiving child pornography challenged the district court's imposition of a supervised release condition dictating that he could not "possess, procure, purchase, or otherwise obtain access to any form of computer network, bulletin board, Internet or exchange format involving computers unless specifically approved by the U.S. Probation Office." 173 F.3d at 125. The district court found that this restriction on the defendant's Internet access was "reasonably related to [his] . . . criminal activities, to the goal of deterring him from engaging in further criminal conduct, and to protecting the public," in light of the fact that the defendant had once used the Internet as a means to develop an illegal sexual relationship with a young girl. <u>Id.</u> at 127. The court was unpersuaded by the defendant's argument that the Internet prohibition was overly broad and would unnecessarily restrict his career opportunities and his freedoms of speech and expression. Noting that supervised release conditions restricting employment and First Amendment freedoms are permissible if the statutory tailoring requirements are satisfied, the court ultimately concluded that the restriction on the defendant was not overly

than to the bank larceny conviction at issue in that case. The <u>Peterson</u> court accordingly determined that such restrictions were neither reasonably related to the defendant's conviction nor reasonably necessary to the statutory sentencing objectives. <u>See</u> <u>id.</u>

28

broad despite its effects on his business opportunities and expressive activities.

As in Crandon, the supervised release condition at issue in the instant case is reasonably related to Paul's offense and to the need to prevent recidivism and protect the public. The record reveals that Paul has in the past used the Internet to encourage exploitation of children by seeking out fellow "boy lovers" and providing them with advice on how to find and obtain access to "young friends." Restricting his access to this communication medium clearly serves the dual statutory goals of protecting the public and preventing future criminal activity. While the condition at issue in the instant case is broader than the restriction at issue in Crandon because it prohibits access to both computers and the Internet and it contains no proviso permitting Paul to use these resources with the approval of his probation office, we cannot say that that the district court abused its discretion in determining that an absolute ban on computer and Internet use was reasonably necessary to protect the public and to prevent recidivism.

In arguing that the district court's computer and Internet prohibition was an abuse of discretion, Paul points to the Tenth Circuit's decision in United States v. White, 244 F.3d 1199 (10th Cir. 2001). In White, the court of appeals remanded to the sentencing court a special condition of supervised release that

29

was substantially similar to Paul's condition.[16]  While the Tenth Circuit was unclear about the scope of the restriction at issue in that case, it indicated that if the condition were read to absolutely ban all Internet and computer use, it would be "greater than necessary" to serve the goals of supervised release outlined in 18 U.S.C. § 3583(d).  Id. at 1206.  The Tenth Circuit reasoned that Crandon did not dictate a different result.  While acknowledging that the Third Circuit did uphold an Internet restriction in Crandon, the White court noted that the Crandon court did not impose an absolute ban on computer or Internet access, despite the fact that the defendant in Crandon (unlike the defendant in White) had clearly used the Internet to "initiate and facilitate a pattern of criminal conduct and victimization that produced an immediate consequence and directly injured the victim" in that case.  Id. at 1205.

We find the Tenth Circuit's reasoning in White unpersuasive. Initially, we note that there is some evidence that Paul did in fact use the Internet to "initiate and facilitate a pattern of criminal conduct and victimization," and thus that White can be distinguished on these grounds.  More importantly, we reject the White court's implication that an absolute prohibition on

---

[16]    The supervised release condition at issue in White dictated that the defendant (who was convicted of receiving child pornography) "shall not possess a computer with Internet access throughout his period of supervised release."  White, 244 F.3d at 1201.

30

accessing computers or the Internet is per se an unacceptable condition of supervised release, simply because such a prohibition might prevent a defendant from using a computer at the library to "get a weather forecast" or to "read a newspaper online" during the supervised release term. Id. We find that such a supervised release condition can be acceptable if it is reasonably necessary to serve the statutory goals outlined in 18 U.S.C. § 3583(d). In the instant case, the district court had strong evidentiary support for its determination that a strict ban on computer and Internet use was reasonably necessary. Moreover, Paul has articulated no specific objections to the computer and Internet ban suggesting how his occupational affairs or his expressive activities will be adversely impacted by the fact that he will be unable to "use a computer or the Internet at a library, cybercafe or . . . an airport" during the term of his supervised release.[17] We conclude that the district court did not abuse its discretion in imposing this condition of supervised release.

C. The Restrictions on "photographic equipment, audio/video equipment, or any item capable of producing a visual image"

Paul also challenges the restrictions on his ability to use photographic equipment and audio/video equipment. He argues that this prohibition is not reasonably related to his offense because

---

[17] The record reveals that Paul has primarily been employed in recent years as a truck driver.

31

there is no indication that he used cameras to further the crime for which he was convicted.  He also maintains that this restriction, like the computer restriction, is unreasonably broad because it involves a greater deprivation of liberty than is reasonably necessary to achieve the legitimate goals of his supervised release.  The government responds that this restriction is necessary to serve public safety goals and to deter Paul from committing future criminal conduct.

We reject Paul's contention that this condition should be vacated because it is not reasonably related to his offense.  As detailed above, special conditions of supervised release are evaluated to determine if they are reasonably related to four different factors: (1) "the nature and circumstance of the offense and the history and characteristics of the defendant," (2) the need "to afford adequate deterrence to criminal conduct," (3) the need "to protect the public from further crimes of the defendant," and (4) the need "to provide the defendant with needed [training], medical care, or other correctional treatment in the most effective manner."   18 U.S.C. § 3553(a)(1)-(2) (1994).  Paul appears to be arguing that the ban on photographic equipment and audio/video equipment is invalid because it is not reasonably related to the first of these criteria, but he evaluates the condition only with respect to the conduct underlying his offense, neglecting to consider whether the condition is reasonably related to his "history and

32

characteristics."

Information in the record about Paul's history and characteristics supports the district court's determination that it was both reasonable and necessary to prohibit Paul from accessing photographic equipment and audio/video equipment during his term of supervised release. The search of Paul's apartment revealed photographs of naked children, including some children that were identified as being local neighborhood children. Moreover, the materials found in Paul's apartment advertising his "medical" examinations and lice removal services provide further evidence that he likely engaged in production (not mere possession) of child pornography in the past. In light of this information, a supervised release condition limiting Paul's ability to create images of children is unquestionably "related to" his history and characteristics.

The district court sufficiently demonstrated why this prohibition is also reasonably related to a legitimate need to protect the public and prevent recidivism. As the district judge noted at the sentencing hearing, "to the extent that . . . I'm concerned about exploitation of children, especially if they are children who are being approached under the auspices of medical care, I'm concerned about having any kind of photographic equipment that would allow you to exploit that situation." The restriction on Paul's ability to access photographic and audio-video equipment is thus based on the district court's valid

33

concern that Paul could use such equipment to exploit children in the future, and the condition is reasonably related to those concerns.

Paul contends that even if this condition is related to the appropriate statutory factors, it is broader than necessary to serve these goals. While the district court made no explicit finding in support of its implicit determination that this condition was necessary to promote public safety and to prevent Paul from repeating his crimes, there is ample evidence in the record supporting this determination. Moreover, the only specific objection to this condition that Paul raises is that the prohibition will prevent him from pursuing his interests in photography and repairing cameras. As these interests are mere hobbies, the detrimental impact of this restriction appears slight.[18] We cannot say that the district court abused its

---

[18] If these interests were Paul's primary means of supporting himself, a supervised release condition restricting his ability to engage in these occupations would be subject to a somewhat higher standard of scrutiny under the Sentencing Guidelines. An occupational restriction is valid only if "a reasonably direct relationship exist[s] between the defendant's occupation . . . and the conduct relevant to the offense of conviction; and . . . imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted." U.S. SENTENCING GUIDELINES MANUAL § 5F1.5 (1998). Such restrictions should be imposed only "for the minimum time and to the minimum extent necessary to protect the public." Id. Despite this higher standard, conditions of supervised release imposing occupational restrictions are routinely upheld. See United States v. Goodman, 232 F.3d 902 (10th Cir. 2000) (unpublished table decision), available at 2000

34

discretion in determining that the condition of supervised release restricting Paul's access to photographic and audio/video equipment was necessary to protect the public and to prevent Paul from committing future criminal conduct. Thus, we affirm this condition of supervised release.

## 4. The Sex Offender Registration Requirement

Finally, Paul argues that the district court erred in not affording him pre-sentence notice before imposing the sex offender registration requirement as one of the conditions of his supervised release. Paul maintains that under this court's decision in Coenen, 135 F.3d at 943, a defendant is entitled to pre-sentencing notice that the court is considering requiring sex offender registration as a condition of supervised release. Paul did <u>not</u> raise this objection at the sentencing proceeding, and

---

WL 1616452 (upholding a condition prohibiting the defendant from self-employment or employment as a telemarketer when the defendant's offense arose from a telemarketing scheme); United States v. Choate, 101 F.3d 562 (8th Cir. 1996) (upholding a condition prohibiting the defendant from self-employment because the restriction was reasonably related to the defendant's wire fraud offenses); Malone v. United States, 502 F.2d 554 (9th Cir. 1974) (upholding a condition prohibiting the defendant from accepting employment that directly or indirectly associated him with any Irish organization or movement because the condition was reasonably related to his conviction for exporting guns to the Irish Republic Army).

In the instant case, while Paul has at times sold the cameras that he repairs for extra money, it is clear from the record that photography and camera repair are merely his hobbies and that neither interest rises to the level of an occupation. Under such circumstances, restrictions on Paul's ability to pursue these recreational interests are unquestionably valid if they comply with the less strict statutory standards of 18 U.S.C. § 3583(d).

thus plain error review is appropriate.  See United States v. Lopez, 923 F.2d 47, 49 (5th Cir. 1991).

The government argues that pre-sentence notice was provided because the registration condition was set out in the probation officer's sentencing recommendation attached to the PSR.  The record supports this assertion.  Moreover, the government correctly points out that even if this information had not been attached to the PSR, Paul nevertheless would have had notice of this condition.  The Sentencing Guidelines state that such a provision is a mandatory condition of supervised release under 18 U.S.C. § 3583(a) for anyone convicted of a sexual offense.  See U.S. SENTENCING GUIDELINES MANUAL § 5D1.3 n.1 (1998).  Coenen is distinguishable on this basis.  Coenen was decided prior to the effective date of the amendment to 18 U.S.C. § 3583 making this condition mandatory.[19]  The registration requirements at issue in Coenen were imposed pursuant to a "catch all" provision in the Sentencing Guidelines that did not necessarily provide the defendant with notice of the specific registration requirements that the sentencing court imposed.  Coenen, 135 F.3d at 943.  In

---

[19]    While Paul maintains that he was sentenced under the 1998 Sentencing Guidelines Manual, which does not contain such a mandatory provision, the government correctly points out that the footnote to § 5D1.3 in the 1998 Guidelines Manual explicitly mentions a recent statutory change to 18 U.S.C. § 3583 requiring registration for persons convicted of sexual offenses as a mandatory condition of supervised release and notes that the change becomes effective one year after November 26, 1997.  See U.S. SENTENCING GUIDELINES MANUAL § 5D1.3 n.1 (1998).

the instant case, the language in the Sentencing Guidelines indicating that registration is a mandatory condition of supervised release for sex offenders provided adequate notice of the particular conditions that were ultimately imposed.

In light of these considerations, it is apparent that the district court did not plainly err in imposing the sex offender registration requirement at the sentencing proceeding. We affirm this special condition of supervised release.

## III. Conclusion

For the foregoing reasons, we AFFIRM Paul's conviction and his sentencing determination, including the conditions of his supervised release.