**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 01-40512

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GUADALUPE GOMEZ-CORTEZ,

Defendant - Appellant.

Appeal from the United States District Court
for the Southern District of Texas
(No. 7:00-CR-578)

March 22, 2002

Before ALDISERT,[*] DAVIS and PARKER, Circuit Judges.

PER CURIAM:[**]

Appellant-Defendant Guadalupe Gomez-Cortez (Gomez) was convicted on her plea of having smuggled illegal aliens into the United States in violation 8 U.S.C. § 1324(a). She now appeals the district court's adding two levels to her base offense for "recklessly creating a substantial risk of death or serious bodily

---

[*] Circuit Judge of the Third Circuit, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

injury to another person."  She also appeals the court's imposing eight more levels for a death that allegedly occurred during the course of the offense.  We reverse in part and affirm in part.

**BACKGROUND**

This matter arises from Gomez's efforts to smuggle Issac Rivera-Aguilar (Rivera) into the United States.  Rivera was a 16-year-old from El Salvador who with the financial assistance of his mother paid Gomez and others to transport him to California through Mexico and Texas.  Gomez had been regularly secreting illegal aliens into the United States.  Two that she often worked with were Geraldine Peraza and her son Juan Ruiz, whose house served as a way station in Hidalgo, Texas for illegal aliens in transit.  Sometime in October 2000, Rivera arrived at Ruiz's house.  After several days there, Gomez came to take him on to Brownsville.  When she arrived, Peraza warned her that Rivera "looked ill" and that she should leave him behind until he was better.  Gomez took Rivera to Brownsville anyway.  Four days later, Gomez turned him and three others over to a man known only as Carlos.  Carlos was supposed to take the four on to Houston.

A few days after picking up Rivera, Gomez, along with her husband, Sergio Sierra, returned to Ruiz's house and announced that Rivera had died shortly after arriving in Houston.  Peraza and Ruiz watched as Sierra took a scrap of paper from Gomez's purse and apparently dialed the number for the house in Houston where

Rivera's body supposedly lay. Sierra instructed the person on the other end of the line to "take the boy's body out of the house because the smell would get worse." Peraza later called Rivera's mother, Josefa Aguilar, and told her that her son had died en route to California. Aguilar's sister then called the Border Patrol's McAllen, Texas office, which set in motion a chain of events eventually leading to Gomez's arrest. Rivera's body has not been recovered.

On January 3, 2001, Gomez pleaded guilty to a single count of violating 8 U.S.C. § 1324(a), "bringing in and harboring certain aliens." In its presentence report, the probation office recommended against Gomez receiving an upward adjustment for Rivera's death or for having committed an offense that involved a risk of serious bodily injury or death. The P.S.R. stated: "[I]t is unknown whether the participants of the smuggling venture caused the death, or whether their negligence and/or recklessness contributed to the death." The district court declined to follow the probation office's recommendation. It instead found:

> [A]t the time [Rivera] was transported from the Peraza
> residence to Brownsville and then on to Houston, he was
> ill. And that this Defendant was aware of that. That no
> medical attention was secured for him. And that
> therefore, because of that, that was a reckless creation
> of a substantial risk of death or serious bodily injury

because of transporting an individual through that kind of temperature with an illness.

In accordance with § 2L1.1(b)(5) of the federal sentencing guidelines, the court added two levels to Gomez's base offense for "intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." Then, in accordance with subsection (b)(6) of the same guideline, the court added eight more levels for a death having occurred during the offense. The adjustments increased Gomez's offense level from 12 to 22. After making two other adjustments, the court arrived at a total offense level of 25. The court sentenced her to 71 months' imprisonment, the maximum sentence for someone with Gomez's offense level.

## DISCUSSION

Though we review the district court's application of the sentencing guidelines de novo, we are required to give "'due deference to the district court's application of the guidelines to the facts.'" *See United States v. Paul*, 274 F.3d 155, 162 (5th Cir. 2001)(quoting 18 U.S.C. § 3742(e)). The amount of deference we must give depends on how closely the application turns on the facts, with greatest deference being required when the legal outcome relies "heavily upon an understanding of the significance of case-specific details." *See Buford v. United States*, 532 U.S. 59, 65 (2001). Always accorded great deference, however, are the district court's findings of fact, which we review for clear error only. *See Paul*, 274 F.3d at 161. In making its findings, the

-4-

district court may rely on evidence that would not otherwise be admissible at trial so long as "the information has sufficient indicia of reliability to support its probable accuracy." *See* United States Sentencing Guidelines Manual ("U.S.S.G.") § 6A1.3(a)(2001).

**I.**

Section 2L1.1 is the applicable sentencing guideline in this case. Subsection (b)(5) of that guideline provides: "If the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person, increase by 2 levels . . . ." U.S.S.G. § 2L1.1(b)(5). We have not before considered what sort of conduct constitutes creating the kind of risk described in (b)(5). The district court found that Gomez did not act intentionally, but instead that she acted recklessly. Elsewhere in the guidelines manual, "reckless" is defined as:

> a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation.

U.S.S.G. § 2A1.4 cmt. n.1. Subsection (b)(5) also requires that the defendant acted to put someone at risk of "serious bodily injury," which in the guidelines is defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical

-5-

rehabilitation." U.S.S.G. § 1B1.1 cmt. n. 1(i). Nonserious bodily injury, by way of comparison, "means any significant injury; *e.g.*, an injury that is painful and obvious, or is a type for which medical attention ordinarily would be sought." *Id.* § 1B1.1 cmt. n. 1(b). Finally, the risk of serious bodily injury must be a substantial one. The term "substantial risk" is not defined by the guidelines, but the leading U.S. dictionary defines the word "risk" as "the possibility of loss, injury, disadvantage, or destruction," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1961 (1981), and references the words "material" and "real" as being synonymous with "substantial," *id.* at 2280. Thus, stated differently, subsection (b)(5) applies to conduct in which the defendant knowingly subjected another to a material and real possibility of severe pain or injury requiring prolonged medical intervention.

Against the foregoing interpretation, we conclude that the record does not support the application of subsection (b)(5) in this case. There is no basis for concluding that Rivera was put in peril while being transported from Hidalgo to Brownsville or to anywhere else for that matter. Exposure to peril in transit is by far the most common situation in which other circuits have upheld the application of (b)(5).[1] Here, Gomez drove Rivera from Hidalgo

---

[1] *See, e.g.*, *United States v. Yeh*, 278 F.3d 9, 12 (D.C. Cir. 2002)(aliens left in an overstuffed freighter without food or water); *United States v. Rodriguez-Cruz*, 255 F.3d 1054, 1059 (9th Cir. 2001)(aliens were made to trek through severe weather and across difficult terrain); *United States v. Angwin*, 271 F.3d 786,

to Brownsville, with Rivera riding in the passenger seat the whole way. Assuming for the moment that the area was experiencing unusually cold or wet weather, a supposition that is neither supported by the record nor by our own commonsense understanding of what weather conditions are like in early October in that part of the world, we cannot see how Gomez's taking Rivera on to Brownsville as she did subjected the boy to a real risk of serious bodily injury. And since it is unknown by what mode Carlos took Rivera to Houston, we cannot say that the boy was put at risk on that leg of his trip either. Nor are we persuaded that the state of Rivera's health was such that he could not travel at all. Peraza, who had the opportunity to observe Rivera for serval days, only went so far as to tell Gomez that the boy "looked ill." Having Rivera travel anyway hardly proves Gomez ignored a substantial possibility that the boy would be made to endure severe pain or an injury requiring lasting medical intervention. Moreover, Peraza's opinion about Rivera's condition, and that the boy should be left behind, might have been influenced by her own self-interest, for she was being paid for his lodging. Seeing only scant evidence of the conditions Rivera was made to endure en route to California, and without more particular information about Rivera's supposed illness, we cannot say that Gomez committed

---

809 (9th Cir. 2001)(16 aliens in a motorhome only rated for six persons); *United States v. Kang*, 225 F.3d 260, 262 (2d Cir. 2000)(aliens lodged between drive shaft and engine and exposed to pavement).

Rivera to the sort of risk subsection (b)(5) was designed to protect against. We therefore conclude that district court erred in its application of (b)(5).

## II.

We affirm the district court's application of § 2L1.1(b)(6), however. That provision of the sentencing guidelines requires an eight-level increase if "any person" died during the course of a § 1324 offense. *See* U.S.S.G. § 2L1.1(b)(6)(4). Gomez argues that there was insufficient evidence to conclude that Rivera died while being smuggled, the boy's body never having been recovered. We disagree. A preponderance of the evidence is all that is required to show the existence of a disputed sentencing factor. *See Paul*, 274 F.3d at 164. Gomez claims that her knowledge of Rivera's whereabouts is limited to a call she received from Carlos, who claimed the boy had died in Houston or on the way there. Nevertheless, we note that Gomez and Sierra deemed this information sufficiently reliable to convey it to their fellow smugglers upon returning to Hidalgo. Indeed, having supposedly received only Carlos's report, Sierra promptly made arrangements to have Rivera's body moved from the house in Houston.

## CONCLUSION

We REVERSE the district court's adding two levels in accordance with U.S.S.G. § 2L1.1(b)(5), but we AFFIRM its

application of subsection (b)(6) of the same guideline.  Consistent with the foregoing, we REMAND for purposes of resentencing.