**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4852

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

PAUL GLEN HAMILTON, JR.,

       Defendant - Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg.  Gina M. Groh, Chief District Judge. (3:19-cr-00010-GMG-RWT-1)

Argued:  December 11, 2020                    Decided:  January 22, 2021

Before WILKINSON, AGEE, and RICHARDSON, Circuit Judges.

Affirmed in part and vacated and remanded in part by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Richardson joined.

**ARGUED:**  Kristen Marie Leddy, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant.  Kimberley DeAnne Crockett, OFFICE OF THE UNITED STATES ATTORNEY, Martinsburg, West Virginia, for Appellee.  **ON BRIEF:**  William J. Powell, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

WILKINSON, Circuit Judge:

In July 2019, Paul Glenn Hamilton, Jr., pled guilty to one count of possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B), (b)(2). He was sentenced to ten years of incarceration to be followed by a lifetime of supervised release. In this appeal, he challenges three of the special conditions of his supervised release. With one exception, we reject those challenges.

## I.

The record in this case reflects the disturbing manipulation and brutal sexual exploitation of a fourteen-year-old girl, A.C., by a twenty-three-year-old man. Hamilton met A.C. online and corresponded with her for nine months before meeting her in person. He admitted to police that, soon after he started messaging her, he realized that she was fourteen years old but said that he was okay with her young age. During that time, Hamilton directed her to send him sexually explicit photographs of herself and instructed her in performing sexual conduct. Hamilton also sent her nude videos of himself. A search of his phone revealed fifty-three photographs and twenty-six videos of A.C. that were sexually explicit.

On September 11, 2018, at Hamilton's direction, A.C. took a Lyft from her home in West Virginia to Hamilton's house in Maryland. During the hour-and-a-half drive, A.C. was on the phone giving a road-by-road accounting of the route. Hamilton directed her to be dropped off a few houses down from his residence, so as not to alert his parents with whom he was living. Hamilton hid her in his closet for several hours until his parents left the house and raped her twice before taking her into Virginia on the way to South Carolina.

2

During the trip, Hamilton took her cell phone, so that she had no way of contacting her parents. She was able to steal her phone back briefly and contacted her parents, who alerted the police. Hamilton and A.C. stopped at a motel in Suffolk, Virginia, where he sexually assaulted her a third time and photographed the two of them together in bed. Defendant forced A.C. into the shower with him, at which point the police knocked on the door. He threatened to kill A.C. if she responded to the police, but the police were able to retrieve her from the hotel room.

The officers took A.C. to a medical facility in Virginia for a rape kit, which positively identified Hamilton's DNA in the sample collected. While the officers were at the medical center, Hamilton's cell phone pinged at A.C.'s address in West Virginia. Defendant was then arrested in Berkeley County, West Virginia. Despite a protective order prohibiting Hamilton's contact with A.C., he later tried to get a message to her through a friend of hers on social media.

Hamilton was indicted on one count of possession of child pornography in the Northern District of West Virginia on January 23, 2019. On July 24, he pled guilty to that charge. He was later sentenced to ten years of imprisonment and a lifetime of supervised release with the standard conditions of supervision, as well as twenty-five special conditions. He objected to the following conditions as being overbroad and not sufficiently related to his conduct: (7) "You must not work in any type of employment without the prior approval of the probation officer;" (11) "You must not access the Internet except for reasons approved in advance by the probation officer;" and (12) "You must not go to, or remain at, any place where you know children under the age of 18 are likely to be, including

3

parks, schools, playgrounds, ball fields, childcare facilities, movies, and arcades." J.A. 104. The district court overruled his objections and Hamilton timely appealed.

## II.

## A.

As part of an overhaul of the federal criminal code in the 1980s, Congress abolished parole for federal prisoners and replaced it with a system of supervised release. *See* Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987, 1999–2000, 2027. Unlike parole, supervised released is imposed by district courts for a particular term at sentencing and "does not replace a portion of the sentence of imprisonment." U.S.S.G. § 7A2(b) (2018).

District judges exercise significant discretion in setting the length and conditions of supervised release within parameters set by both federal statutes and the Sentencing Guidelines. First and foremost, 18 U.S.C. § 3583 sets out the general authority for district courts to impose a term of supervised release with the maximum length dictated by the felony class. The statute provides an exception to these maximums for crimes under § 2252A that requires a minimum of five years and allows up to a lifetime of supervised release. *Id.* § 3583(k). When setting the duration and terms of supervised release, district courts must take into account factors similar to those that guide their discretion in imposing a term of imprisonment. *Id.* § 3583(c). These factors include

> (1) "the nature and circumstances of the offense and the history and characteristics of the defendant,"
> (2) "adequate deterrence to criminal conduct,"
> (3) "protect[ion of] the public from further crimes of the defendant,"
> (4) effective education, training, and treatment for the defendant,

4

(5) "the applicable guidelines or policy statements issued by the Sentencing Commission,"
(6) "the need to avoid unwarranted sentence disparities among defendants with similar records," and
(7) "the need to provide restitution to any victims." *Id.* § 3553(a).

In addition to a set of mandatory conditions, the district court may order a "further condition of supervised release, to the extent such [a] condition . . . is reasonably related to the" aforementioned factors, "involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth" above, and "is consistent with any pertinent policy statements issued by the Sentencing Commission." *Id.* § 3583(d). Section 3583 also provides for the modification, termination, extension, and revocation of supervised release by the district court. *See id.* § 3583(e).

Second, the Sentencing Guidelines supplement the statutory provision with additional guidance for the imposition of supervised release. For example, they include a policy statement that "the statutory maximum term of supervised release is recommended" for those convicted of sex offenses. U.S.S.G. § 5D1.2 (2018). The Guidelines provide further detail and expand upon the mandatory conditions of supervised release provided by statute. *See id.* § 5D1.3(c). They also similarly explain the special conditions that are recommended for particular cases, such as when the defendant has dependents, debt obligations, substance abuse problems, mental health difficulties, or, as relevant to this case, sex offense convictions. *See id.* § 5D1.3(d). For sex offenders, the Guidelines recommend requiring participation in a treatment program, limiting computer use, and requiring consent to random, warrantless searches of person and property. *See id.* § 5D1.3(d)(7).

5

Taking these two sources together reveals a system that vests substantial discretion in the district court for determining the length and conditions of supervision. The defendant's assigned probation officer also has discretion and plays a significant role in the day-to-day management of supervised release. For example, the probation officer provides the defendant with instructions on reporting, provides authorization as to appropriate living situations, determines whether the defendant can leave the judicial district in which he resides, and visits and inspects the defendant's home for contraband items. *See id.* § 5D1.3(c), (d)(7)(C). The probation officer is required to report certain violations of supervised release to the court but has discretion not to report minor violations when there is no pattern of non-adherence and the violation does "not present an undue risk to an individual or the public." *Id.* § 7B1.2; *see also* 8E Guide to Judiciary Policy and Procedures, Supervision of Federal Offenders § 620.40 (2010) (outlining different possible probation officer responses to supervised release violations). Thus, the district court and the probation officer work together with substantial statutory and Guidelines discretion in the crafting and management of supervised release.

B.

This system of supervised release serves several purposes as demonstrated by the selected sentencing factors that § 3583 mandates courts consider when setting the term and conditions of supervised release. *See* 18 U.S.C. § 3583(c) (referencing some, but not all, of the sentencing factors in 18 U.S.C. § 3553). Key among these are protection of the public, *see id.* § 3553(a)(2)(C), and rehabilitation of the defendant, *see id.* § 3553(a)(2)(D). In order to meet both of those purposes, supervised release represents a bridge or

6

transitional period from the restrictions of full-scale incarceration to the complete absence of restrictions that comes from outright release. *See* S. Rep. No. 98-225, at 124 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3307 ("[T]he primary goal of such a term is to ease the defendant's transition into the community . . . or to provide rehabilitation."). The goals of protecting the public and rehabilitating the defendant need not be at cross-purposes— the public is better protected when the defendant is rehabilitated and success is more likely without a sudden shift from the completely structured life of incarceration to a completely unstructured one outside the prison walls. *See, e.g.*, *Johnson v. United States*, 529 U.S. 694, 708–09 (2000) ("The congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty."); Note, *Parole: A Critique of Its Legal Foundations and Conditions*, 38 N.Y.U. L. Rev. 702, 702 (1963) (noting, in the parole context, "the legislative conviction that it is more desirable to return the offender to freedom through a period of controlled liberty than abruptly to return him to complete freedom at the termination of his prison sentence"). The statute acknowledges the possibility of some tension in supervised release between protecting the public and assisting the defendant in getting back on his feet. Congress provided district courts with guidance for resolving that tension—the conditions should "involve[] no greater deprivation of liberty than is reasonably necessary for the purposes," such as public protection, of supervised release. 18 U.S.C. § 3583(d)(2).

In addition to these statutory purposes, supervised release also represents an act of faith that conditions less than full-scale incarceration will reduce recidivism and repetition of the misconduct that landed the defendant in jail in the first place. *See, e.g.*, *United States*

7

*v. Siegel*, 753 F.3d 705, 708–09 (7th Cir. 2014) (discussing the role of supervised release in reducing recidivism); *United States v. Rivera*, 192 F.3d 81, 87–88 (2d Cir. 1999) (recognizing the relationship between the term of imprisonment and the term of supervised release in preventing recidivism). But this faith must not be blind. Rather, it must be backed up with meaningful restrictions and reporting requirements or else judges, Congress, and the public will lose confidence in the system's ability both to deter and rehabilitate. After all, it was such a loss in confidence that led to the elimination of parole. *See generally* Fiona Doherty, *Indeterminate Sentencing Returns: The Invention of Supervised Release*, 88 N.Y.U. L. Rev. 958, 991–97 (2013) (discussing "a deep mistrust of the system" due to its arbitrariness, its "vagueness and uncertainty," and questions as to its efficacy in rehabilitation as reasons for federal parole's ultimate demise, *id.* at 992). To avoid a repeat, supervised release must be seen to actually, not just theoretically, work.

III.

In this appeal, Hamilton challenges three special conditions of supervised release: the employment restriction, the Internet restriction, and the location restriction. We address them seriatim.

We review the imposition of special conditions of supervised release "for abuse of discretion, recognizing that district courts have 'broad latitude' in this space." *United States v. Van Donk*, 961 F.3d 314, 321 (4th Cir. 2020) (quoting *United States v. Dotson*, 324 F.3d 256, 260 (4th Cir. 2003)). As noted in the previous section, discretion is baked into this system at two levels. First, the district judge has substantial discretion in setting

the terms and conditions of release. Second, the probation officer has significant discretion in applying and monitoring the terms and conditions set by the court.

A.

The employment restriction states that Hamilton "must not work in any type of employment without the prior approval of the probation officer." J.A. 104. Defendant argues that this "condition is not reasonably related to the facts of the case, and . . . is overly broad in its scope." Appellant Brief at 8–9. We agree that this condition was overbroad and lacked a sufficient nexus to the nature and circumstances of the offense.

Although the statutory grant of authority to district courts does not limit the kinds of special conditions they may impose, it does require that any such condition be "reasonably related to," *inter alia*, "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. §§ 3553(a)(1), 3583(d)(1); *see also* U.S.S.G. § 5D1.3(b) (2018). Furthermore, the condition must "involve[] no greater deprivation of liberty than is reasonably necessary" to effectuate the statutory purposes. 18 U.S.C. § 3583(d)(2); *see also* U.S.S.G. § 5D1.3(b). The Guidelines, moreover, provide greater specificity for the imposition of occupational restrictions. Sentencing "court[s] may impose a condition . . . prohibiting the defendant from engaging in a specified occupation, business, or profession, or limiting the terms on which the defendant may do so, only if [they] determine that: (1) a reasonably direct relationship existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction; and (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will

9

continue to engage in unlawful conduct similar to that for which the defendant was convicted." U.S.S.G. § 5F1.5(a). The Guidelines further stipulate that if the court imposes such an occupational restriction, it "shall impose the condition for the minimum time and to the minimum extent necessary to protect the public." *Id.* § 1.5(b). As the Seventh Circuit explained, "an occupation restriction requires a nexus between the underlying offense of conviction and the occupational ban." *United States v. Farmer*, 755 F.3d 849, 855 (7th Cir. 2014).

To ensure comportment with the statutory requirements, "[a] sentencing court must provide an individualized explanation for why any special conditions it imposes are appropriate in light of the § 3583(d) factors." *United States v. Van Donk*, 961 F.3d 314, 322 (4th Cir. 2020). The district court explained that the concern animating the employment condition was Hamilton's "ability to come into contact with children that he can prey upon" and noted that "there's a multitude of ways and different types of employment that he can come into contact with potential victims." J.A. 49. The court's rationale for the condition was that it was "reasonable and necessary to protect the public," that there were too many problematic occupations for her to name them with specificity, and that defendant's "actions . . . involved deception," which made him "exactly the type of defendant who needs some hard, firm rules." J.A. 49–52.

Some restriction on employment may indeed be in order, but the all-encompassing restriction here lacks an appropriate nexus to "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). And the district court did not explain how, under the Guidelines, there was "a reasonably direct relationship . . . between the defendant's occupation . . . and

10

the conduct relevant to the offense." U.S.S.G. § 5F1.5(a). The employment restriction was not limited, for example, to jobs that involve regular or private contact with minors, or to occupations that would provide Hamilton ready opportunity to ply his proclivities for child sexual abuse. Like the self-employment ban the Seventh Circuit confronted in *Farmer*, there is not a "'reasonably direct relationship' between" defendant's "conduct relevant to the offense of conviction" and "the occupation being restricted." 755 F.3d at 856 (quoting U.S.S.G. § 5F1.5(a)). There must be some tailoring of the condition to the circumstances of the case.

The overbreadth and vagueness of the condition leads to a second problem: the probation officer has completely unguided discretion. Unlike an employment condition that prohibits certain types of employment or jobs that involve interacting with certain groups of people, this condition provides Hamilton's probation officer with no bounds on how to exercise his discretion. This lack of "a more definitive standard to guide the probation officer's discretion" gives the officer "an unfettered power of interpretation" that effectively "delegat[es] . . . 'basic policy matters . . . for resolution on an ad hoc and subjective basis'" without providing meaningful guidance to defendant as to the kinds of employment he may accept upon his release. *United States v. Loy*, 237 F.3d 251, 266 (3d Cir. 2001) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)).

This is not to deny probation officers a significant measure of discretion. We recognize the difficulty of writing restrictions that protect the public without turning the conditions sheet into a prolix code of Hammurabian proportions. The "conditions . . . need not 'describe every possible permutation, or spell out every last, self-evident detail'" but

11

can vest some interpretive role in the officer. *Van Donk*, 961 F.3d at 325 (quoting *United States v. Johnson*, 446 F.3d 272, 280 (2d Cir. 2006)). There simply need to be some general parameters set on that discretion related to the record in this case.

Nothing in our decision prohibits the imposition of some special condition on Hamilton's employment prospects. But instructing the probation officer to approve employment opportunities that pose minimal risk of problematic contact with children would seem to assist rather than impair the Guidelines' rehabilitative goals. Withal, we do not think it advisable to attempt to devise a term and condition of supervised release from this altitude. The most appropriate course of action is to vacate this condition and remand with directions to the district court—which has a far better view of the whole record in this case—to craft more precisely an employment restriction that bears a nexus to the defendant's particular misconduct without jeopardizing the salient goal of safeguarding children's safety.

B.

We turn next to Hamilton's challenge to the Internet condition. The eleventh special condition prohibits defendant from "access[ing] the Internet except for reasons approved in advance by the probation officer." J.A. 104. He "argues that this special condition is impermissibly overly broad" because his supervised release "will last his entire lifetime." Appellant Brief at 11. We reject this challenge.

Around the country, courts have confronted Internet restrictions similar to this one and some have found them to be too stringent. *See, e.g.*, *United States v. Perazza-Mercado*, 553 F.3d 65, 73–74 (1st Cir. 2009) (vacating a categorical residential Internet ban); *United*

12

*States v. Voelker*, 489 F.3d 139, 144 (3d Cir. 2007) (vacating total computer and Internet ban); *United States v. Holm*, 326 F.3d 872, 877–78 (7th Cir. 2003) (vacating ban on possession "or use of computers with Internet capability"). This court too has confronted the issue and found that condition to be unwarranted. *See United States v. Ellis*, --- F.3d ----, 2021 WL 68064 (4th Cir. Jan. 8, 2021). As both *Ellis* and our sister circuits have recognized, the Internet is crucial in findings jobs, paying bills, and navigating life in this digital age. *See, e.g.*, *United States v. LaCoste*, 821 F.3d 1187, 1191 (9th Cir. 2016) ("Use of the Internet is vital for a wide range of routine activities in today's world . . . ."). We are conscious of the fact that this kind of condition is a very significant impediment on a person, and we by no means think that it is appropriate in every case. *See, e.g.*, *Ellis*, 2021 WL 68064, at *6 (vacating total Internet ban after finding no "evidence linking [defendant's] offense or criminal history to unlawful use of the internet"). However, the particular facts and circumstances of this case set it apart from those overly broad bans, and the district court justified it on those very facts.

This condition clearly meets the statutory requirements of § 3583(d), as there is both a connection to "the nature and circumstances of the offense and the history and characteristics of the defendant" and a need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(1), (2)(C). As Chief Judge Groh explained when imposing the condition, "the internet was the mechanism by which the defendant committed this crime." J.A. 55. The Internet was "how he found the victim in this case" and the Internet was how he "contacted her after [the kidnapping] when she was in treatment." J.A. 53–54.

13

There are two key threads running through the cases vacating a total Internet ban, which distinguish Hamilton's situation from those cases. First, in many cases, there is simply "no evidence of online criminality at all." *Ellis*, 2021 WL 68064, at *6 n.8; *see also, e.g.*, *Perazza-Mercado*, 553 F.3d at 69 (vacating the ban "where the defendant ha[d] no history of impermissible internet use"); *United States v. Eaglin*, 913 F.3d 88, 97 (2d Cir. 2019) (finding that the Internet had nothing to do with the defendant's "offense of failing to register as a sex offender"). Hamilton's offense is far afield from these circumstances. There is no dispute that defendant used the Internet to find his victim, communicate with her for months, and coerce her into creating and sending him a torrent of sexually explicit images.

For cases in which there is Internet criminality, the second thread distinguishes between "non-contact child pornography activity, or similar conduct, on the internet"—in which a total ban sweeps too broadly, *Ellis*, 2021 WL 68064, at *8—and cases in which there is contact with a minor, such as this one. *Compare Holm*, 326 F.3d at 878 (vacating total Internet ban after child pornography conviction because there was not "at least some evidence of the defendant's own outbound use of the Internet to initiate and facilitate victimization of children"); *United States v. Sofsky*, 287 F.3d 122, 126–27 (2d Cir. 2002) (vacating total Internet ban where defendant had received child pornography over the Internet); *United States v. Wiedower*, 634 F.3d 490, 495 (8th Cir. 2011) (vacating total Internet ban where defendant had sought out and received child pornography over the Internet); *with United States v. Paul*, 274 F.3d 155, 168 (5th Cir. 2001) (upholding total Internet ban where defendant not only possessed child pornography, but also advised others

14

"how to 'scout' single, dysfunctional parents and gain access to their children"); *United States v. Crandon*, 173 F.3d 122, 125, 127–28 (3d Cir. 1999) (upholding total Internet ban where defendant used Internet "to develop an illegal sexual relationship with a young girl over a period of several months" that led to statutory rape of the victim, *id.* at 127). Again, there is no dispute that Hamilton had sexual contact with an underaged girl, which led not only to the creation of some of the pornographic material underlying his charge, but eventually to his repeated raping and kidnapping his victim. Without defendant's access to the Internet, none of this tragic sequence would have transpired.

The First Circuit has articulated three factors with which to analyze broad restrictions on Internet access: "(1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted." *Perazza-Mercado*, 553 F.3d at 70. All three factors suggest the Internet restriction was justified in this case. There is no question that defendant used the Internet to commit this offense. As the government discussed at sentencing, Hamilton also has "a history of enticing minors to send him sexually explicit pictures" and "a history of violence towards girls." J.A. 79. Finally, defendant has the "particular and identifiable characteristic[]" of defying restrictions placed upon him. In this very case, Hamilton used social media to have one of A.C.'s friends send her a message on his behalf in defiance of a protective order that prohibited his contact with her of any kind. J.A. 82. The defendant's history of willful disobedience of court orders suggests that a more narrowly tailored ban is not sufficient to meet the statutory goal of "protect[ing]

15

the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). And that is precisely what Chief Judge Groh found when she rejected defendant's objection. *See* J.A. 55. The special condition is necessary to prevent this kind of misconduct from ever happening again.

Hamilton protests that the Internet restriction is for life, and we note that the statutory scheme is not without some flexibility. Section 3583 allows for the modification of supervised release if "such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). If Hamilton goes in for treatment, has a period of good behavior, and makes demonstrable progress over a sustained period of time, perhaps the court (or probation officer, whose advance approval for Internet usage is presently required) might allow some Internet usage with the installation of a monitoring device. But that is all in the speculative and contingent future, and we do not presume to suggest how or when or whether the condition should be modified or what changes must come to pass before such a modification is considered.

We thus reject Hamilton's challenge to the Internet restriction.

## C.

Finally, we consider the restriction on defendant's movement. The twelfth special condition of supervision prohibits Hamilton from "go[ing] to, or remain[ing] at, any place where [he] know[s] children under the age of 18 are likely to be, including parks, schools, playgrounds, ball fields, childcare facilities, movies, and arcades." J.A. 104. Defendant argues that this condition is "overly broad and impermissibly vague." Appellant Brief at 13. We disagree.

16

The district court rejected Hamilton's objection to this restriction because it was "absolutely necessary to protect the public against this defendant." J.A. 57–58. Chief Judge Groh explained that the list of places, the probation officer, and common sense could provide guidance as to whether a given location was somewhere defendant was allowed to be. *See* J.A. 58.

Given the statutory factors and defendant's conduct, this condition is not overbroad. It is not a restriction "greater than necessary . . . to protect the public from further crimes of the defendant" given "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a). As noted before the district court, Hamilton "has a history of enticing minors" and his cell phone pinged at the victim's address after the police had rescued her from him. J.A. 21, 79. This suggests Hamilton's inability to stay away from places that he ought not be. Thus, a broad term is necessary to protect the public.

As our sister circuits have found, this kind of restriction is also not too vague. *See, e.g.*, *United States v. MacMillen*, 544 F.3d 71, 75–76 (2d Cir. 2008); *United States v. Crume*, 422 F.3d 728, 733–34 (8th Cir. 2005); *United States v. Taylor*, 338 F.3d 1280, 1286 (11th Cir. 2003); *Paul*, 274 F.3d at 165–67. "A condition of supervised release is unconstitutionally vague if it doesn't give a probationer 'fair notice of the conduct that it punishes' or is 'so standardless that it invites arbitrary enforcement.'" *Van Donk*, 961 F.3d at 323–24 (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015)). As the Fifth Circuit noted in *Paul*, "courts must inevitably use categorical terms to frame the contours of supervised release conditions" and those "terms can provide adequate notice of

17

prohibited conduct when there is a commonsense understanding of what activities the categories encompass." *Paul*, 274 F.3d at 167. The movement restriction here provides examples of prohibited places, and defendant can use common sense and consult his probation officer if there is any doubt as to a particular location. *See Van Donk*, 961 F.3d at 324 ("Vagueness issues are mitigated where the regulated party has 'the ability to clarify the meaning of the regulation by [his] own inquiry.'" (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982))). And there is no concern of inadvertent violation because the term covers only places he "know[s]" children "are likely to be." *See MacMillen*, 544 F.3d at 76. The knowledge requirement alleviates the fair notice concern inherent in vagueness challenges. *Van Donk*, 961 F.3d at 325 ("A scienter requirement like this mitigates vagueness concerns."); *see also United States v. Burroughs*, 613 F.3d 233, 246 (D.C. Cir. 2010) (noting that an associational restriction does not cover "inadvertent or chance contact," rendering it unobjectionable).

In sum, we uphold this condition of supervised release as it is neither overly broad nor vague.

IV.

For the foregoing reasons, we affirm the judgment of the district court as to the Internet restriction and the movement restriction and vacate it as to the employment restriction and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART AND*
*VACATED AND REMANDED IN PART*

18