**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4466

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MARYSA RENEE COMER,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Max O. Cogburn, Jr., District Judge. (3:18–cr–00230–MOC–DSC–1)

Argued: May 7, 2021                                      Decided: July 21, 2021

Before KEENAN, WYNN, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Keenan and Judge Thacker joined.

**ARGUED:** Megan Coyle Hoffman, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Anthony Martinez, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

WYNN, Circuit Judge:

Defendant Marysa Comer was convicted of conspiring to engage in sex trafficking after she lured women into prostitution via social media and, in at least one case, attempted to use Facebook to force a young woman who had left her trafficking ring to return. Later, while on supervised release from her trafficking conviction, Comer used Facebook to help broker a drug deal.

In light of this history, the district court imposed a special condition of supervised release stating that Comer "shall not have any social networking accounts without the approval of [her] U.S. Probation Officer." J.A. 115.[1] On appeal, Comer challenges the imposition of this social networking condition on several grounds. Finding no error, we affirm.

Comer also contends that the district court should have ordered her probation officer not to sit at the Government's table during her supervised-release hearing. While we find no plain error in the district court's management of the hearing, we join the Seventh Circuit in cautioning against sitting Probation with the Government while in the courtroom.

I.

If not for the predations of a much older man, Comer may never have encountered the federal justice system. From approximately 2009 through 2014, David Delay ran a sex-trafficking operation in Washington State. He inveigled women into prostitution by telling

---

[1] Citations to "J.A. __" and "S.J.A. __" refer, respectively, to the Joint Appendix and Sealed Joint Appendix filed by the parties in this appeal.

them that he was making an HBO documentary about escorting and that if they turned over their earnings to him, he would pay each of them $20 million once his documentary was produced.

In March 2014, Delay began an online romantic relationship with Comer, then a 19-year-old living in North Carolina. Delay tricked Comer into joining him in Washington and promptly began to pimp and physically and emotionally abuse her.

Comer eventually stopped having sex for money and started luring new women to the operation through online dating websites. Comer also began to use "emotional, verbal, and physical abuse to keep [her victims] engaged in prostitution." S.J.A. 124. Her conduct regarding a developmentally delayed high-school student known as M.K. illustrates this abuse.

Comer met M.K. on the dating website Meetme.com and persuaded her to leave her family and to move in with Delay and Comer. Once Delay and Comer had M.K. in their grasp, Comer pimped and physically abused M.K., "punch[ing], slap[ping], shov[ing], kick[ing], and throw[ing] things at her" if she refused to sleep with johns. *Id.* at 125. She also controlled M.K. in other ways, such as by monitoring M.K.'s communications on her phone and computer. M.K. eventually braved her fear of angering Delay and Comer and left the operation—at which point Comer demanded her return, threatening to post explicit photos of her on Facebook if she did not comply. When M.K. refused to return, Comer made good on her threat—she locked M.K. out of her own Facebook account and then used the account to post photos of M.K. naked and in salacious poses.

Comer was arrested in January 2015 and later that year she pled guilty in the Western District of Washington to conspiracy to engage in sex trafficking by force, fraud, and coercion in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(c). In 2016 and early 2017, Comer violated several conditions of her bond, including "by using a computer and accessing the internet" and by ordering an unauthorized smartphone online. *Id.* at 121–22. As a result, her bond was revoked in March 2017 and she was incarcerated pending sentencing. In December 2017, Comer was sentenced to three years' imprisonment and five years of supervised release.

Comer was released and began her term of supervision in February 2018. A few months later, she returned to North Carolina to serve her period of supervised release under the jurisdiction of the Western District of North Carolina.

Shortly thereafter, Comer began violating the conditions of her release. First, she violated a condition barring her from communicating with felons by using an encryption app on her phone to communicate with a felon named Jordan whom she met on Facebook. Despite knowing that Jordan faced felony charges for financial crimes, Comer "helped [Jordan] sell drugs to her friends" by referring drug-seeking friends to Jordan.[2] *Id.* at 150. Second, Comer violated a condition consenting to ongoing monitoring of her electronic devices by maintaining a hidden, unmonitored phone. This was no inadvertent violation. According to the testimony of her probation officer, Comer conceded that her father told

_____

[2] While the record does not establish how Comer directed her friends to Jordan to buy drugs, it is uncontested that she met Jordan on Facebook and that she abused Facebook while on supervised release by communicating with him.

her to report the phone to the probation officer, but she declined because "she figured [P]robation wouldn't allow it." J.A. 70.

The district court held a revocation hearing in June 2019. The court concluded that Comer had violated five terms of her release, revoked her supervision, and sentenced her to time served and five additional years of supervised release.[3] The effect of the hearing was thus to extend the end date of her supervision from February 2023 to June 2024. The district court also imposed a new, additional special condition stating that Comer was "not [to] have any social networking accounts without the approval of the U.S. Probation Officer." *Id.* at 115.

The social networking condition was discussed at length during the hearing. The Government argued the condition was appropriate because of Comer's sex-trafficking activities, which included using social networking sites like Meetme.com and Facebook, and because of her more recent use of Facebook to facilitate drug activity. Comer objected to the condition, primarily on the grounds that it was a "greater deprivation of liberty than necessary" and "an impermissible delegation of [judicial] authority to [P]robation." *Id.* at 102–03. Comer's probation officer, Chelsey Padilla, described how she planned to enforce the social networking condition, stating that she "would not keep [Comer] from reading the news" or "going on to [the professional networking website] LinkedIn," but would

---

[3] Comer's five violations were: unauthorized computer access, failure to comply with computer monitoring, failure to comply with mental-health treatment requirements, and two counts of unauthorized communication and/or interaction with a felon.

prevent her from using Facebook, Tinder, and "other dating apps" where she might "meet[]" or "recruit[]" other women. *Id.* at 99–100.

The district court approved of the social networking condition based on Comer's conduct while in Washington and her post-release misdeeds in North Carolina. Thereafter, the district court issued its judgment and Comer timely appealed.

## II.

On appeal, Comer argues that the social networking condition: (1) is unconstitutionally vague; (2) is overbroad; (3) violates her fundamental liberties; and (4) impermissibly delegates to her probation officer the power to determine what constitutes a social networking website. We disagree.

### A.

Comer first argues that the social networking condition should be vacated because it "contains vague language that does not provide [her] with fair notice of what behavior is actually restricted." Opening Br. at 7. We review vagueness challenges to conditions of supervised release de novo. *United States v. Sandidge*, 863 F.3d 755, 758 (7th Cir. 2017) ("[A] vagueness challenge is a legal question on which we owe no deference to the district court; our review is de novo.").

"The void for vagueness doctrine is rooted in the Due Process Clause of the Fifth and Fourteenth Amendments." *Manning v. Caldwell*, 930 F.3d 264, 272 (4th Cir. 2019). It is principally concerned with providing individuals with adequate notice of what conduct they cannot engage in and with delineating clear limits on the enforcement power of the state. *See United States v. Van Donk*, 961 F.3d 314, 324 (4th Cir. 2020). Thus, as we

recently explained in *United States v. Van Donk*, "[a] condition of supervised release is unconstitutionally vague if it doesn't give a probationer 'fair notice of the [punished conduct]' or is 'so standardless that it invites arbitrary enforcement.'" *Id.* at 323–24 (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

Applying this standard, courts have vacated conditions of supervised release that, for example, prohibited a father from contacting his son except "for normal familial relations." *United States v. Hall*, 912 F.3d 1224, 1226 (9th Cir. 2019) (per curiam). Other courts have found impermissibly vague, for instance, conditions banning "any use of alcohol that adversely affects [the] defendant's employment, relationships, or ability to comply with the conditions of supervision," *Sandidge*, 863 F.3d at 758–59 (alteration in original), as well as requirements to "support . . . dependents and meet other family responsibilities," "work regularly at a lawful occupation," and, as "directed by [a] probation officer," to "notify third parties of risks that may be occasioned by [the defendant's] personal history or characteristics," *United States v. Evans*, 883 F.3d 1154, 1162–64 (9th Cir. 2018).

But we have never required district courts to craft their conditions of supervised release with exhaustive specificity. *See United States v. Hamilton*, 986 F.3d 413, 420 (4th Cir. 2021) ("We recognize the difficulty of writing restrictions that protect the public without turning the conditions sheet into a prolix code of Hammurabian proportions."); *United States v. Abbate*, 970 F.3d 601, 604 (5th Cir. 2020) ("[S]upervised release conditions 'do not have to be cast in letters six feet high, or . . . describe every possible permutation, or . . . spell out every last, self-evident detail.'" (quoting *United States v. Paul*,

274 F.3d 155, 167 (5th Cir. 2001))). Rather, "'courts must inevitably use categorical terms to frame the contours of supervised release conditions' and those 'terms can provide adequate notice of prohibited conduct when there is a commonsense understanding of what activities the categories encompass.'" *Hamilton*, 986 F.3d at 423 (quoting *Paul*, 274 F.3d at 167).

Here, while there is admittedly some gray space on the margins as to what activity the social networking condition restricts, there is also the requisite "commonsense understanding" of what activity Comer may not engage in without the permission of her probation officer. *See id.* Drawing on the ordinary meaning of the term as informed by dictionaries, *cf. Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."), we understand a "social networking account" to be an account on a website or app that is primarily intended to facilitate social introductions between two or more persons through the use of personal profiles for the purposes of friendship, meeting others, or information exchanges.[4] Thus, the commonsense

---

[4] *See, e.g.*, Oxford English Dictionary (Online 3d ed. 2009) (defining "social networking" as "the use of websites which enable users to interact with one another, find and contact people with common interests, etc."); Dictionary.com, https://www.dictionary.com/browse/social-networking (last visited June 28, 2021) (defining social networking as "the use of websites or other online technologies to communicate with people and share information, resources, etc."); Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/social-networking (last visited June 28, 2021) (defining social networking as "the use of websites and other internet services to communicate with other people and make friends"); *see also* Merriam-Webster, https://www.merriam-webster.com/dictionary/social%20networking (last visited June 28,

meaning of the condition is that Comer may not have any social networking accounts, so defined, without her probation officer's permission.[5]

This reading of the social networking condition is also consistent with Probation's explanation of the condition during Comer's supervised-release hearing. While the text of a special condition of supervised release remains the most important source of information for defining an otherwise undefined special condition, courts may also look to a probation officer's statements or instructions to the releasee to determine whether a potentially vague term provides the releasee fair notice of the conduct they must not engage in. *See United States v. Romero*, 676 F.2d 406, 407 (9th Cir. 1982) (Kennedy, J.) ("The probation order of the court is the principal determinant of the conditions of probation, but it is not the sole source for defining the conditions. In addition to the bare words of the probation condition, the probationer may be guided by the further definition, explanations, or instructions of the district court and the probation officer."); *see also United States v. King*, 608 F.3d 1122, 1128–29 (9th Cir. 2010) ("A probation officer's instructions are relevant to whether a supervised release condition gives fair warning of prohibited conduct."); *United States v. Loy*, 237 F.3d 251, 266 (3d Cir. 2001) ("[T]here is no question that 'in addition to the bare words of the probation condition, the probationer may be guided by further instructions of

---

2021) (defining social networking as "the creation and maintenance of personal and business relationships especially online").

[5] The Government concedes that the condition applies only to having "accounts." Response Br. at 34. This means Comer is in no danger of having her supervised release revoked because she, for example, opens a post from Instagram (a photo-sharing app) that a friend texts her if she herself does not have an Instagram account.

the probation officer.'" (quoting *Romero*, 676 F.2d at 407)); *United States v. Gallo*, 20 F.3d 7, 13 (1st Cir. 1994) ("The meaning of a probation order [is not necessarily confined to the text of the order and] may be illuminated by the . . . probation officer's instructions.").

During the hearing, Comer's probation officer, Padilla, explained that she would enforce the condition to apply to Facebook and to dating apps that would allow Comer to meet, befriend, and potentially "recruit[]" women into prostitution, and would not apply it to "keep [Comer] from reading the news."[6] J.A. 99–100. This description suggests that the term "social networking accounts," as used in Comer's conditions of supervision, is truly about *social* networks—websites and apps designed primarily to allow individuals to meet and communicate. Padilla's description of the condition therefore conforms with the dictionary definitions in suggesting that a social-networking site is meant primarily to facilitate social introductions.

Under this definition of a social networking account, Comer clearly could not maintain a profile on a dating app (like Bumble or Tinder), but could just as clearly maintain an online account with a news website (like the New York Times) or a shopping website (like Amazon). Thus, the term "social networking account" as used in Comer's supervised release conditions carries with it a commonsense meaning, which tempers any

---

[6] Padilla also stated that she would not prevent Comer from "going on to LinkedIn to make herself . . . better for the job world." J.A. 99. As a LinkedIn account falls squarely within our commonsense definition of a social networking account, we take this statement to mean that Padilla planned to allow Comer to use LinkedIn, not that the website did not constitute a social network. Having made this representation, Padilla may not now seek to revoke Comer's supervision for using LinkedIn unless she first provides Comer with fair notice that LinkedIn is now off-limits.

concern that the social networking condition is unconstitutionally vague. *See Hamilton*, 986 F.3d at 423.

Our holding that the social networking condition is not unconstitutionally vague is supported by three considerations regarding how the condition is to be applied to Comer.

First, as we explained in *Van Donk*, "[v]agueness issues are mitigated where the regulated party has 'the ability to clarify the meaning of the regulation by its own inquiry.'" 961 F.3d at 324 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)). While the average citizen does not "have regular meetings with Congress . . . to ask what statutes . . . mean," *id.*, individuals who, like Comer, are on supervised release can always ask their probation officers what activities they are permitted to engage in, *see Hamilton*, 986 F.3d at 423 (explaining that if a releasee had questions about the meaning of a potentially vague condition of supervised release, he could "consult his probation officer"). Indeed, Comer's probation officer has a statutory obligation to explain Comer's conditions of release to her. 18 U.S.C. § 3603(1) ("A probation officer shall instruct a . . . person on supervised release . . . as to the conditions specified by the sentencing court."); *see United States v. Robertson*, 948 F.3d 912, 920 (8th Cir. 2020) (explaining that if a defendant is confused as to what a condition requires of them, they may always ask questions of their probation officer, "who is statutorily required to instruct [them] as to the conditions specified by the sentencing court" (quoting *United States v. Forde*, 664 F.3d 1219, 1224 (8th Cir. 2012))). This means there is little practical risk of Comer violating the social networking condition through a simple misunderstanding of its bounds. This substantially mitigates the fair-notice concern underlying the void-for-

11

vagueness doctrine.[7] *See Hamilton*, 986 F.3d at 423 (finding vagueness concern regarding condition of release to be reduced by the releasee's ability to seek clarification from his probation officer).

Second, even if Comer did inadvertently maintain a social networking account without Probation's approval, her release could not be revoked because of that accidental transgression because, as a "general rule[,] . . . probationers may not be punished for inadvertent violations." *Van Donk*, 961 F.3d at 324. To be sure, this social networking condition lacks an explicit scienter requirement. However, given our recent declaration in *Van Donk* that probationers generally "may not be punished for inadvertent violations," we do not hesitate to read an implied knowledge requirement into the condition.[8] *Id.*; *accord United States v. Johnson*, 446 F.3d 272, 281 (2d Cir. 2006) ("Generally, supervised release provisions are read to exclude inadvertent violations."). Indeed, the Government encourages us to do so. *See* Response Br. at 32–33. This second layer of protection "satisf[ies] us that there [is] no due process issue" with imposing the social networking condition on Comer. *Van Donk*, 961 F.3d at 324; *cf. Hamilton*, 986 F.3d at 424 (explaining

---

[7] We do not mean to suggest, however, that a "condition with *no core meaning*" could "be cured by allowing the probation officer an *unfettered power of interpretation*." *Loy*, 237 F.3d at 266 (emphases added). Rather, we agree with the Third Circuit that such a condition "would create one of the very problems against which the vagueness doctrine is meant to protect, i.e., the delegation of 'basic policy matters to policemen . . . for resolution on an ad hoc and subjective basis.'" *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)).

[8] That said, it is generally "preferable for the district court to specify limitations in a condition of supervised release in the condition itself at the time of sentencing, rather than leaving it to the appellate court to interpolate the limitations." *United States v. Thompson*, 777 F.3d 368, 380 (7th Cir. 2015).

that an explicit knowledge requirement in a condition of supervised release "alleviate[d] the fair notice concern inherent in vagueness challenges").

Finally, Comer can always bring an as-applied challenge down the road if she believes her rights have been violated by a specific application of the condition. *See Van Donk*, 961 F.3d at 325–26 ("If vagueness issues do arise, Van Donk may bring an as-applied challenge in revocation proceedings."); *United States v. Phillips*, 704 F.3d 754, 768 & n.13 (9th Cir. 2012) (explaining that judicial review of any alleged violation of an arguably vague condition of release provides "an additional layer of protection" for releasees).

In conclusion, the social networking condition is not unconstitutionally vague because it has a core, commonsense meaning that provides fair notice of what conduct is prohibited, and because Comer has three layers of protection from the fair-notice and arbitrary-enforcement concerns animating the void-for-vagueness doctrine. She can seek guidance from her probation officer, cannot be punished for inadvertent violations, and can always bring an as-applied challenge to future restrictions on her access to social networks.[9]

---

[9] In her reply brief, Comer cites to the Supreme Court's recent decision in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), to argue that the social networking condition is unconstitutionally vague. In *Packingham*, Justice Kennedy, writing for the Court, and Justice Alito, concurring, flagged the broad nature of the terms "social networking" and "social media" in voting to strike down a North Carolina statute prohibiting sex offenders from accessing "a commercial social networking Web site where the sex offender knows that the site permits minor children to become members." *Id.* at 1733, 1736, 1738; *id.* at 1743 n.16 (Alito, J., concurring). However, we do not believe that the Court's discussion of social networking in *Packingham* necessitates holding the social

13

B.

Next, Comer challenges the social networking condition on the grounds that it "requires a greater deprivation of liberty than is reasonably necessary" and thus violates the supervised release statute, 18 U.S.C. § 3583(d)(2). Opening Br. at 20–23. Relatedly, she raises the novel argument that the social networking condition infringes on her due-process liberty interest in "locat[ing] and associat[ing] with a romantic partner," the idea being that, these days, many of us meet our future partners online. *Id.* at 16–17. We are not persuaded.

Federal law grants sentencing judges the discretion to craft special conditions of supervised release, provided that the special conditions "comply with the requirements listed in 18 U.S.C. § 3583(d)." *United States v. Ellis*, 984 F.3d 1092, 1098 (4th Cir. 2021). Those requirements include that the special condition be "(1) reasonably related to the statutory goals of deterrence, protection of the public, and rehabilitation; (2) no greater a deprivation of liberty than is reasonably necessary to achieve those statutory goals; and (3) consistent with any relevant policy statements issued by the Sentencing Commission." *United States v. McMiller*, 954 F.3d 670, 676 (4th Cir. 2020) (internal quotation marks and

---

networking condition to be vague here. For a start, *Packingham* was a First Amendment case, not a void-for-vagueness case. Second, what may be vague in a general criminal law applicable to a broad class of individuals is not necessarily vague as to specific individuals on supervised release. *See Van Donk*, 961 F.3d at 324 (explaining that "precision is especially important" for "static law[s] that appl[y] to a large group of people like . . . criminal statute[s]"); *Manning*, 930 F.3d at 272–73 (explaining that our void-for-vagueness test is flexible and "not applied mechanically," and that "[t]he degree of vagueness tolerated in a law depends in part on the type of statute" at issue).

alteration omitted). Regarding the second requirement, the special condition must be "'the least restrictive alternative' to achieve the statutory purposes." *Ellis*, 984 F.3d at 1104 (quoting *United States v. Malenya*, 736 F.3d 554, 559 (D.C. Cir. 2013)).

Further, because the government may lawfully restrict individuals on supervised release from engaging in otherwise constitutionally protected conduct—like "leaving [their] judicial district[s] without permission"—supervised release conditions are not constitutionally infirm as long as they "comport[] with 18 U.S.C. § 3583(d)." *Van Donk*, 961 F.3d at 326 (explaining that a condition of supervised release that satisfied § 3583(d)'s requirements was therefore immune from a First Amendment overbreadth challenge); *see also United States v. Henson*, 22 F. App'x 107, 112 (4th Cir. 2001) (per curiam) ("A special condition of supervised release may restrict fundamental rights when the special condition 'is narrowly tailored and is directly related to deterring [the defendant] and protecting the public.'" (alteration in original) (quoting *United States v. Crandon*, 173 F.3d 122, 128 (3d Cir. 1999))). In other words, when a defendant challenges their conditions of supervised release on constitutional grounds, we must evaluate that challenge through the lens of the requirements of § 3583(d). Accordingly, regardless of whether Comer in fact has a substantive-due-process right to find a romantic partner online—a question we need not answer—her challenge cannot succeed if the condition meets the requirements of § 3583(d), including that it is no greater a deprivation of liberty (constitutionally protected or otherwise) than is reasonably necessary to achieve the statutory goals of § 3583(d).

When a defendant challenges the imposition of a special condition of supervision by asserting that it is overbroad under § 3583(d), we review the district court's decision to

15

impose the condition for abuse of discretion. *See Van Donk*, 961 F.3d at 321–22. To determine whether special conditions of supervised release that impose "broad restrictions on Internet access" comply with § 3583(d)'s requirements, we consider three factors: (1) whether "the defendant used the internet in the[ir] underlying offense"; (2) whether "the defendant had a history of improperly using the internet to engage in illegal conduct"; and (3) whether "particular and identifiable characteristics of the defendant suggested that such a restriction was warranted." *Hamilton*, 986 F.3d at 421–22 (adopting factors articulated by the First Circuit in *United States v. Perazza-Mercado*, 553 F.3d 65, 70 (1st Cir. 2009)).

Applying these factors here, it is clear that the district court did not abuse its discretion by imposing the social networking condition.[10] First, Comer indisputably weaponized social networks like Meetme.com and Facebook to commit her underlying offense. They were the crucial instrumentalities through which she recruited others into prostitution and, at least in the case of M.K., tried to prevent them from leaving. Second, Comer has a history of using social networks for illegal conduct, as exemplified by her use of Facebook while on supervised release to try to broker a drug deal. Third, Comer has a "particular and identifiable characteristic[]" suggesting that the condition was warranted, namely her habit of thumbing her nose at attempts to restrict her access to the internet. *Id.* at 422. While out on bond in Washington, she violated the conditions of her bond by accessing the internet without permission and by ordering an unauthorized, internet-

---

[10] Indeed, during oral argument, Comer's attorney candidly conceded that the district court would have been within its authority to ban Comer from using the internet altogether.

capable phone online. Once back in North Carolina, she again maintained an illegal phone that she elected not to disclose to Probation. Furthermore, Comer's probation officer reported that during the time in which Comer was living in North Carolina before the imposition of the social networking condition, she "never made a payment" toward the monitoring of her smartphone after paying an initial $30 installation fee. S.J.A. 152.

Given these facts, the district court did not abuse its discretion by imposing the condition. The condition advanced the statutory goals of deterrence, protecting the public, and rehabilitation, and it deprived Comer of no more liberty than was necessary to accomplish these goals—even if it does prevent her from finding a romantic partner online during the period of supervision.

In fact, given Comer's past, it was reasonable for the district court to conclude that any lesser restriction on her ability to access online social networks—like banning her only from Facebook or from specific dating apps, or merely requiring her to submit to the kind of monitoring she had circumvented in the past—would have jeopardized public safety. *See Hamilton*, 986 F.3d at 421–22 (explaining that a condition more narrowly tailored than a lifelong ban on accessing the internet without Probation's permission would not be sufficient to protect the public from the defendant in light of "[t]he defendant's history of willful disobedience of court orders"). Therefore, we reject her overbreadth and liberty arguments against the challenged condition.

## C.

Finally, Comer argues that the district court "violated Article III when it delegated to Probation the authority to determine what websites and apps constitute social

networking." Opening Br. at 23. "We review constitutional non-delegation challenges to conditions of supervised release de novo." *United States v. Ullmann*, 788 F.3d 1260, 1264 (10th Cir. 2015).

Generally, "courts may use nonjudicial officers, such as probation officers, to support judicial functions, as long as a judicial officer retains and exercises ultimate responsibility." *United States v. Miller*, 77 F.3d 71, 77 (4th Cir. 1996). "Of course, 'the type of duty that the court may [so] delegate is limited' by Article III." *Van Donk*, 961 F.3d at 327 (quoting *United States v. Johnson*, 48 F.3d 806, 808–09 (4th Cir. 1995)). Specifically, courts "can't delegate core judicial functions such as the authority to decide the amount of a fine or restitution payment, or whether a defendant must attend a treatment program." *Id.* (internal quotation marks, alteration, and citations omitted); *see also, e.g.*, *United States v. Wagner*, 872 F.3d 535, 543 (7th Cir. 2017) (holding that a district court impermissibly delegated to a treatment provider the decision of whether a defendant could access adult pornography); *United States v. Mike*, 632 F.3d 686, 696 (10th Cir. 2011) ("[A] district court cannot delegate the decision of whether to subject a defendant to residential treatment or penile plethysmograph testing to the probation officer.").

We recently applied these principles in *Van Donk*, where we rejected a non-delegation challenge to a term of supervised release that required a defendant to "comply with the rules of his sex-offender treatment program." 961 F.3d at 316, 327–28. There, we contrasted permissible delegations, in which district courts permitted probation officers or therapists to fashion the means or details of court-ordered therapy, with impermissible delegations, where probation officers or therapists were empowered to determine whether

a defendant needed to attend therapy at all, or were permitted to impose conditions on the defendant unrelated to their therapy without judicial review. *Id.* at 327–28. Furthermore, we found it relevant that the district court retained "ultimate responsibility over the core judicial function of deciding whether [the defendant] ha[d] violated his conditions of supervised release." *Id.* at 327. That is, the defendant's supervised release was not "automatically revoke[d]" when he was expelled from his treatment program. *Id.* Rather, he was given a hearing on the issue, which afforded him "due process without [having the district court] micromanag[e] his treatment." *Id. Van Donk* thus instructs that as long as the court orders the broad principle guiding the condition of release and retains the ultimate authority over revoking release, the court may allow the probation officer to fill in many of the details necessary for applying the condition.

Here, the district court did not impermissibly delegate its Article III authority to Comer's probation officer when it authorized her to allow Comer to maintain social networking accounts with her permission. The district court established the principle that Comer could not maintain social networking accounts without permission and, as in *Van Donk*, maintains the core judicial function of determining whether Comer violates her conditions of release. Furthermore, Probation cannot punish Comer. It merely supports the judicial function of imposing supervised release by determining if she can maintain certain social networking accounts, a decision that itself is subject to review by the district court.

Our sister circuits agree. The Fifth Circuit has squarely rejected the contention that no-internet-without-probation's-permission conditions impermissibly delegate Article III authority. *See United States v. Halverson*, 897 F.3d 645, 659 (5th Cir. 2018) (reasoning

19

that such conditions are permissible delegations because they do not allow probation officers to punish defendants or require anything "in the nature of punishment" of them). The Eleventh Circuit also recently reached the same decision, albeit in an unpublished opinion. *United States v. Bush*, 848 F. App'x 392, 396 (11th Cir. 2021) (per curiam) (holding that the district court "did not improperly delegate authority to the probation office" when it imposed a condition of supervised release requiring the defendant to "seek prior approval from his probation officer before accessing . . . the internet," as this requirement simply left the officer "with the ministerial function of [determining] how, when, and where [the defendant] c[ould] access . . . the internet"). Meanwhile, it does not appear that any court has found that no-internet-without-probation's-permission conditions impermissibly delegate Article III authority, even though our sister circuits affirm the imposition of such conditions with some frequency.[11]

In conclusion, considering Fourth Circuit case law permitting probation officers to support judicial functions and our sister circuits' conclusions that district courts can allow probation officers to make internet-access determinations without violating Article III, we hold that no impermissible delegation occurred here. Accordingly, we affirm the district court's imposition of the condition.

III.

---

[11] *See, e.g.*, *United States v. Bobal*, 981 F.3d 971, 976–78 (11th Cir. 2020); *United States v. Perrin*, 926 F.3d 1044, 1045, 1050 (8th Cir. 2019); *United States v. Rock*, 863 F.3d 827, 831 (D.C. Cir. 2017).

Separately, Comer argues that the district court violated separation-of-powers and due-process principles by permitting Comer's probation officer, Padilla, to sit at the Government's table during Comer's revocation hearing and to whisper to the Government's counsel during the hearing. Comer asks us to "vacate her revocation judgment and remand to the district court . . . to conduct a [new] revocation hearing in which the probation officer acts as a neutral arm of the judiciary." Opening Br. at 28. We conclude that no new hearing is necessary.

Because Comer did not preserve this argument, we review for plain error.[12] *United States v. Harris*, 890 F.3d 480, 490–91 (4th Cir. 2018). "There is plain error only when '(1) an error was made; (2) the error is plain; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Fall*, 955 F.3d 363, 373 (4th Cir. 2020) (quoting *Harris*, 890 F.3d at 491).

Comer's argument that the district court violated separation-of-powers and due-process principles rests on the Seventh Circuit's decision in *United States v. Turner*, 203 F.3d 1010 (7th Cir. 2000). In *Turner*, the defendant argued that his probation officer violated the separation of powers by acting as a surrogate prosecutor rather than as a

---

[12] "A party may preserve a claim of error by informing the court . . . of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." Fed. R. Crim. P. 51(b). Here, while defense counsel did comment during Comer's hearing that she was "not privy to the same information probation is currently adding to the prosecutor because they don't sit at our table," J.A. 87, counsel did not preserve a claim of error on this point by either (1) asking the district court to order Padilla to reveal what she had said to the Government's counsel and/or to sit elsewhere or (2) objecting to Padilla's conduct and explaining that Comer's objection was rooted in separation-of-powers and due-process concerns. Accordingly, this argument has not been preserved and our plain-error standard of review applies.

21

"neutral arm of the court." *Id.* at 1013. However, the Seventh Circuit concluded that "[t]here [was] no separation of powers problem" in light of defense counsel's admission that the probation officer "in no way acted as an adversary against [the defendant] but maintained her position as an arm of the Court." *Id.* at 1014. *Turner* then "suggest[ed] to district judges, U.S. Attorneys, and probation officers that steps be taken to prevent the perception that probation officers are 'surrogate prosecutors.'" *Id.* Specifically, the Seventh Circuit advised that "[i]t may be that a separate small table could be placed to one side inside the rail where the probation officer is equally available to the district judge and to the other parties as needed." *Id.* It is on this advisory language—about best practices, not legal requirements—that Comer pins her argument.

Whatever *Turner*'s persuasive value, advice from a single out-of-circuit case cannot establish plain error. To be plain, an error must be "clear or obvious at the time of appellate consideration." *United States v. Collins*, 982 F.3d 236, 241 (4th Cir. 2020) (quoting *United States v. Ramirez-Castillo*, 748 F.3d 205, 215 (4th Cir. 2014)). Specifically, an error is only plain if "the settled law of the Supreme Court or this circuit establishes that an error has occurred."[13] *United States v. Carthorne*, 726 F.3d 503, 516 (4th Cir. 2013) (quoting *United States v. Maxwell*, 285 F.3d 336, 342 (4th Cir. 2002)). Accordingly, the district court's

---

[13] In rare circumstances, an error can also be plain if, in the absence of controlling authority from the Supreme Court or this circuit, our sister circuits have taken a uniform position on the issue. *Carthorne*, 726 F.3d at 516 n.14. Such a circumstance is not present here.

practice of permitting Padilla to sit at the Government's table provides no basis for vacating its judgment.

With that said, we understand Comer's frustration with this arrangement and, like the Seventh Circuit, believe that the perception of fairness in federal courts will be strongly advanced by sitting probation officers apart from either defendants or the Government. After all, "the probation officer is an agent of the court." *United States v. Washington*, 146 F.3d 219, 223 (4th Cir. 1998). "As an arm of the court, [they are] not supposed to take an adversarial role in a sentencing or revocation hearing." *United States v. White*, 868 F.3d 598, 604 (7th Cir. 2017). Defendants will better understand this crucial role if probation officers are not literally sitting with the prosecution. As a result, they may come to better trust the officers tasked with helping them transition to law-abiding lives. At the end of the day, by sitting at a separate table, the probation officer, as an arm of court, avoids the appearance of impropriety and so promotes the public's confidence in the evenhanded administration of justice.

## IV.

For the reasons set forth above, we affirm the district court's imposition of the social networking condition and find no plain error in its management of Probation's conduct during Comer's supervised release hearing.

*AFFIRMED*